OPINION OF THE COURT
 

 Chief Judge Wachtler.
 

 The question in this case is whether a "taking” of property occurs, giving rise to the obligation to pay fair compensation (NY Const, art I, §7; US Const 5th & 14th Amends), when the State requires a nursing home to remain open until reasonable alternative arrangements can be made for the continued care of the patients. We conclude that under the facts and circumstances presented here the State’s actions, preventing the precipitous closing of a nursing home in contravention of the regulations of the Department of Health, did not constitute a "taking” of property under the Federal or State Constitutions.
 

 The facility in question, known as "Abbott Manor Nursing Home” and situated in Buffalo, New York, was operated by Bernard Birnbaum until his death on February 13, 1976. Shortly thereafter, the executors of Bernard’s estate, the respondents here, determined that the nursing home was currently unprofitable, primarily because the facility’s Medi
 
 *642
 
 caid reimbursement rate was insufficient to cover the actual cost of operation. Respondents pursued various avenues to attempt to rectify this situation. They sought an increase in the Medicaid reimbursement rate, arguing that without immediate corrective action the operation of the nursing home could not continue. Respondents also sought to either sell the facility, or obtain a receiver who would operate the nursing home and guarantee reimbursement of all operating expenses.
 

 These efforts proved unavailing, and on September 3, 1976, respondents sent telegrams to the next of kin of the nursing home patients receiving Medicaid informing them that because the Department of Health refused to pay for medicine and medical care "we are unable to continue care”, and, "[accordingly, you are advised to make the necessary arrangements to have your relative removed no later than September 7, 1976 at
 
 7:00
 
 p.m.” The kin of the approximately 30% of patients cared for by means other than Medicaid received a somewhat fuller explanation.
 

 The State, by order to show cause, immediately commenced an action in Supreme Court to enjoin respondents from closing the nursing home until the requirements of 10 NYCRR 401.3 (g)
 
 [1]
 
 could be met. This section requires that the operator of a nursing home give 90 days’ notice, and obtain the approval of the Commissioner of Health, before closing a facility. The State also sought and obtained a temporary restraining order preventing the displacement of patients until the merits of the action were heard. Respondents opposed the granting of an injunction, and counterclaimed, seeking both the appointment of a receiver "pursuant to § 2810 of the Public Health Law of the State of New York”, and full reimbursement from the State for the costs of operating the nursing home.
 

 Upon consideration of the merits, by order dated November 26, 1976, Supreme Court appointed two longtime employees of the nursing home as coreceivers to operate the facility. By further order dated December 29, 1976, Supreme Court determined that the State was responsible for the actual cost of care and treatment during the period of receivership. The numerous hearings and orders that followed are substantially recounted in
 
 People v Abbott Manor Nursing Home
 
 (70 AD2d 434,
 
 affd for reason stated below
 
 52 NY2d 766) and need only
 
 *643
 
 be summarized here. On January 10, 1978 Supreme Court directed the receivers to issue a 90-day notice of closure due to the nursing home’s continued financial difficulty. The receivers, however, citing the shortage of alternative facilities that could care for the nursing home’s patients, moved in Supreme Court for an order continuing the receivership for one year. The State opposed the motion and argued that, if necessary, any extension should be for a more limited duration; respondents, however, did not oppose the extension of the receivership. On May 8, 1978, Supreme Court temporarily resolved the issue by terminating the appointment of the present receivers, and appointing the Commissioner of Health as receiver in their place, with the term of the new receivership to survive until further order of the court.
 

 Following the issuance of the December 29, 1976 order providing them with the right to fully recover their operating costs, respondents’ attitude toward the prospect of closing the nursing home changed dramatically. Thus on December 20, 1978 respondents sought and received a temporary restraining order barring the State from removing any Medicaid patients from Abbott Manor, except voluntarily or in an emergency. Indeed, in support of this request respondents argued that closure was not in the "public interest” because of the lack of available alternative facilities for patients, and decried the affect of closure on patients who were "reluctant to leave” the "desirable” facility, where they have received "very satisfactory quality of medical care and services * * * during the period of their residence”. Nevertheless, the State was apparently successful in finding alternative means of care for the nursing homes patients, and after vacating the facility the Commissioner of Health moved in Supreme Court for an order terminating the receivership. This order was granted over the objection of respondents, and on September 14, 1979 the receivership was terminated, ceasing Abbott Manor’s operation as a nursing home.
 

 Eventually, all issues concerning the propriety of the appointment of the various receivers and the award of full operating costs were consolidated in one appeal in the Appellate Division, Fourth Department. That court first held that although Public Health Law § 2810 did not specifically authorize the appointment of a receiver in the situation presented, the receivership appointments nevertheless were proper under the equitable powers of the court. The Appellate Division then determined, however, that the Court of Claims had sole juris
 
 *644
 
 diction regarding respondents’ claim that they were “entitled to be compensated for [the] actual costs for providing the services for the patients” during the receivership period, and, therefore, the court dismissed respondents’ claim for compensation
 
 (People v Abbott Manor Nursing Home, supra,
 
 at 436). This court affirmed on the opinion by Justice Witmer at the Appellate Division
 
 (People v Abbott Manor Nursing Home,
 
 52 NY2d 766,
 
 supra).
 

 Respondents then commenced the present action in the Court of Claims, alleging that the imposition of the receivership, which essentially required that respondents remain in business against their will, was a "taking” under the Federal and State Constitutions, for which fair compensation was now required. Respondents moved for summary judgment on this issue and the Court of Claims granted the motion, holding that the State’s actions were analogous to the wartime temporary seizure cases
 
 (see, e.g., United States v PeWee Coal Co.,
 
 341 US 114). The Appellate Division affirmed, without opinion.
 
 [2]
 
 We now reverse.
 

 I
 

 The nursing home industry, without a doubt, “is subject to extensive State regulation pursuant to article 28 of [the Public Health Law] and title 10 of the Official Compilation of Codes, Rules and Regulation of the State of New York”
 
 (Matter of Sigety v Hynes,
 
 38 NY2d 260, 268). The Legislature has long recognized that in the health care industry "duplication of facilities and * * * under-utilized services in one area contrast with long waiting lists for admission to facilities in other areas * * * resulting in] higher costs [and] * * * threatening] access to care and emergency services for many of our citizens” (L 1969, ch 957, legislative findings and purpose). In an effort to control costs and ensure adequate provision of
 
 *645
 
 nursing home facilities, under the Public Health Law a nursing home cannot be established or operated unless "there is a public need therefor”
 
 (Matter of Hamptons Hosp. & Med. Center v Moore,
 
 52 NY2d 88, 93;
 
 see,
 
 Public Health Law § 2801-a [3]; § 2805). The rates charged for nursing home care are also strictly controlled
 
 (see,
 
 Public Health Law §§2807, 2808).
 

 This regulatory scheme, designed to tailor supply closely to demand in an effort to contain health care costs, largely protects the nursing home operator from competition. It also results in a lack of excess nursing home facilities, which poses an obvious threat to the continuity of essential services if an operator closes a facility. In contemplation of this predicament, the Commissioner of the Department of Health promulgated section 401.3 (g) of title 10 of the NYCRR, which states that no nursing home "shall discontinue operation or surrender its operating certificate unless 90 days’ notice of its intention to do so is given to the commissioner [of health] and his written approval obtained.”
 

 In the case now before us, although Abbott Manor was operating at a loss, the State refused to allow the closure of the facility by respondents before they complied with 10 NYCRR 401.3 (g). Respondents argue that this constituted a taking, because the State’s actions "place[d] a burden on [respondents] to continue the operation of the Home at a substantial loss for the benefit of patients, public, or the State of New York”.
 

 To determine if a taking occurred here, indeed we must assess whether respondents were alone required to shoulder a public burden which, in fairness, should have been the responsibility of the public as a whole
 
 (see, e.g., Pennell v City of San Jose,
 
 485 US 1, —, 108 S Ct 849, 856;
 
 French Investing Corp. v City of New York,
 
 39 NY2d 587, 596-597). This analysis generally requires an ad hoc, factual inquiry using the increasingly familiar factors of the economic impact of the government’s action, its frustration of "reasonable investment-backed expectations”, and the action’s public purpose or "character”
 
 (see, e.g., Penn Cent. Transp. Co. v New York City,
 
 438 US 104, 124;
 
 Kaiser Aetna v United States,
 
 444 US 164, 175;
 
 Rochester Gas & Elec. Corp. v Public Serv. Commn.,
 
 71 NY2d 313, 324). Even if the economic impact upon an owner of property is minimal, however, and does not significantly affect investment-backed expectations, the Supreme Court of
 
 *646
 
 the United States has held that where a "permanent physical occupation” has occurred, the "character of the government action” may become determinative and establish the presence of a taking
 
 (Loretto v Teleprompter Manhattan CATV Corp.,
 
 458 US 419, 426). Nevertheless, compensation will not be required, even where governmental destruction of property is involved, if the government’s action was necessary to stop an illegal activity, or prevent an impending danger emanating directly from the use or condition of the property
 
 (see, e.g., Miller v Schoene,
 
 276 US 272, 280;
 
 Keystone Bituminous Coal Assn. v DeBenedictis,
 
 480 US 470, 490, 492, n 22).
 

 While we have not previously analyzed how these factors should be applied, and whether a taking occurs, when a business is required to continue operations at a loss, the question is not novel; it has been recognized by the United States Supreme Court
 
 (see, e.g., Brooks-Scanlon Co. v Railroad Commn.,
 
 251 US 396;
 
 Regional Rail Reorganization Act Cases,
 
 419 US 102, 122) and thoroughly considered in the Federal courts
 
 (see, e.g., Matter of Valuation Proceedings Under §§ 303 [c] & 306 of Regional Rail Reorganization Act,
 
 439 F Supp 1351 [Friendly, J.];
 
 Gibbons v United States,
 
 660 F2d 1227;
 
 Lehigh & New England Ry. Co. v Interstate Commerce Commn.,
 
 540 F2d 71). This line of cases begins with
 
 BrooksScanlon Co. v Railroad Commn. (supra,
 
 at 399), where Justice Holmes, writing for the court, stated that under the Fifth Amendment a person "cannot be compelled to carry on even a branch of business at a loss, much less the whole business”. Modern cases have emphasized the narrowness of the
 
 "BrooksScanlon”
 
 rule, however, and the limitation of a person’s right to cease business operations consistently has been held not a per se taking where a pervasively regulated industry is involved, and there exists an administrative procedure requiring that permission be obtained from a regulatory agency before service to the public is terminated
 
 (see, e.g., Gibbons v United States, supra; Lehigh & New England Ry. Co. v Interstate Commerce Commn., supra; Continental Air Lines v Dole,
 
 784 F2d 1245). Under these circumstances, the courts have concluded that a business "may be made to suffer interim reasonable losses, without compensation, for a reasonable period of time during which solutions accommodating the public and private interests can be devised”
 
 (National Wildlife Fedn. v Interstate Commerce Commn.,
 
 850 F2d 694, 708 [quoting
 
 Le-high & New England Ry. Co. v Interstate Commerce Commn., supra,
 
 at 837]).
 

 
 *647
 
 We conclude, under these principles, that the application of 10 NYCRR 401.3 (g), to require that respondents continue providing nursing home services, did not immediately constitute a taking. Initially, it does appear that the State’s actions had some negative economic impact upon respondents, because Abbott Manor continued to run at a deficit during the receivership period. The extent of this impact in real terms is greatly lessened, however, when it is recognized that the losses incurred during this period were no greater than those suffered by the nursing home before the receivership began, and that the State’s action, in any event, did not deprive respondents of the opportunity to recover their investment by selling the nursing home. Furthermore, in light of the presence of the regulation specifically barring a nursing home from immediately discontinuing services, the State’s prevention of respondents’ attempt to close Abbott Manor did not, under any reasonable view, affect respondents’ "investment-backed expectations”
 
 (see, Rochester Gas & Elec. Corp. v Public Serv. Commn., supra,
 
 at 325). More troubling, however, is respondents’ contention that the action here was tantamount to a physical occupation of the property, so that the "nature of the government action” becomes dispositive and establishes a taking
 
 (see, Loretto v Teleprompter Manhattan CATV Corp., supra,
 
 at 426). Nevertheless, even accepting this characterization, respondents’ conclusion is not warranted.
 

 "Long ago” stated the United States Supreme Court, "it was recognized that 'all property in this country is held under the implied obligation that the owner’s use of it shall not be injurious to the community’ ”, and that the State’s actions to enforce this obligation is not a taking
 
 (Keystone Bituminous Coal Assn. v DeBenedictis, supra
 
 at 491-492 [quoting
 
 Mugler v Kansas,
 
 123 US 623, 665]). Respondents in this case possessed the exclusive right to operate a nursing home solely because the public interest, as assessed by the Legislature and the Department of Health, required exclusivity. This grant by the State, while benefiting respondents, also put them in the position to create an immediate scarcity of medical care if services were terminated abruptly. When the State confers an exclusive franchise upon an individual incidental to providing a public good, it need not subject itself to the uncontrolled discretion of the individual to instantaneously create a public emergency. Instead, we conclude that the State may enforce the obligation, embodied in a regulation, that there shall not be immediate termination of nursing home services, because
 
 *648
 
 that use of the property threatens an imminent injury to the public
 
 (see, Keystone Bituminous Coal Assn. v DeBenedictis, supra,
 
 at 491-492).
 

 Consequently, we agree with the apparently unanimous view of the courts that have considered the question, that under these circumstances the application of a regulation requiring that a business not terminate services, used for a reasonable period of time so that an agency may devise solutions accommodating the public and private interests, is a valid regulation and does not constitute a taking of private property for public use
 
 (see, e.g., Lehigh & New England Ry. Co. v Interstate Commerce Commn., supra,
 
 at 82;
 
 Gibbons v United States, supra,
 
 at 1238;
 
 Continental Air Lines v Dole, supra,
 
 at 1251-1252;
 
 Matter of the Valuation Proceedings Under §§ 303 [c] & 306 of Regional Rail Reorganization Act, supra,
 
 at 1371;
 
 see also, Davidson v Commonwealth,
 
 8 Mass App 541, 395 NE2d 1314, 1318 [the government’s assumption of the operation of a nursing home in response to a public emergency was a valid exercise of the police power, and not a taking]). Therefore, the application of 10 NYCRR 401.3 (g) here, which barred respondents’ closure of the nursing home at least until such time as they applied to the Commissioner of Health to do so, did not by itself constitute an immediate taking of respondents’ property.
 

 This is not to say that the State could force respondents to operate their business at a substantial loss indefinitely; it has been stated that there does come a time, after government has had a reasonable period to explore alternative solutions, when the individual’s right to terminate a business venture becomes paramount
 
 (see, e.g., Matter of Valuation Proceedings Under §§ 303 [c] & 306 of Regional Rail Reorganization Act, supra,
 
 at 1371). However, while the matter is not without some difficulty, particularly due to the state of the record, we conclude that respondents are not entitled to recover based upon the State’s unreasonable delay in closing Abbott Manor.
 

 The record shows that respondents first attempted to close the nursing home without compliance with 10 NYCRR 401.3 (g), were prevented from doing so by the State, and in the process a receiver was appointed for the facility. Soon after the appointment of a receiver, respondents obtained an order, which proved erroneous, entitling them to full reimbursement for the cost of operating Abbott Manor during the receivership
 
 *649
 
 period. There is nothing in the record reflecting that respondents desired to close the nursing home following the receipt of this order; in fact, likely due to their belief that compensation would be forthcoming, during this period respondents apparently desired that Abbott Manor remain open. In any event, the facility was operated for approximately three years following respondents’ initial attempt to close the nursing home, and the State’s preventative action.
 

 Respondents do argue, however, that any application under 10 NYCRR 401.3 (g), which requires the Commissioner of Health’s approval for the closing of a facility, would have been futile, because there were no alternative facilities available to care for Abbott Manor’s patients; in fact, the Court of Claims accepted this contention. However, the fact remains that respondents’ never made an application to close the facility under 10 NYCRR 401.3 (g), which renders conjectural any conclusion on what would have occurred had a proper application been made. Moreover, on this record it appears that soon after respondents unlawfully attempted to close the nursing home their desire to close the facility ceased. Finally, and most importantly, respondents make no claim in this court that the State required the operation of the nursing home against respondents’ wishes beyond a reasonable time; instead, respondents’ arguments are limited to the contention that they had an absolute right to close Abbott Manor, and that the State’s initial intervention to keep the facility open constituted a taking. Consequently, under these circumstances we are unable to hold that the State’s delay in closing the nursing home at some point became a taking.
 

 In light of our conclusion that no taking occurred here, either immediately upon the State’s prevention of the closing of Abbott Manor or at sometime thereafter, regardless of whether attorney’s fees could have been awarded to respondents had they recovered on their claim, no attorney’s fees may be recovered in this case.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the claim dismissed.
 

 Judges Kaye, Alexander, Titone, Hancock, Jr., and Bellacosa concur; Judge Simons taking no part.
 

 Order reversed, etc.
 

 [1]
 

 . At the time of the State’s application for an injunction the requirements now found in 10 NYCRR 401.3 (g) were found in identical form in 10 NYCRR 701.3 (f) and 401.3 (f).
 

 [2]
 

 .
 
 The Court of Claims grant of summary judgment on this issue left other causes of action pending, and the State’s initial motion for leave to appeal was dismissed for nonfinality (63 NY2d 675), as was the State’s first direct appeal on constitutional grounds (68 NY2d 641). Thereafter, respondents moved in the Court of Claims for attorney’s and accountant’s fees. The Court of Claims awarded fees to respondents, and directed entry of a final judgment indicating that respondents had discontinued or abandoned all causes of action for which they had not been awarded summary judgment. The Appellate Division affirmed, without opinion. The State now appeals pursuant to leave granted by this court, bringing up for review both the prior nonfinal grant of summary judgment, and the later award of fees (CPLR 5602, 5501 [a]).