77 N.Y.2d 340 (1991)
In the Matter of New York State Health Facilities Association, Inc., Respondent,
v.
David Axelrod, as Commissioner of Health of the State of New York, et al., Appellants.
Court of Appeals of the State of New York.
Argued November 14, 1990.
Decided February 19, 1991.
Robert Abrams, Attorney-General (Daniel Smirlock, O. Peter Sherwood and Peter H. Schiff of counsel), for appellants.
Cornelius D. Murray, David M. Cherubin and Bernard Schwartz for respondent.
Chief Judge WACHTLER and Judges SIMONS, KAYE, ALEXANDER and BELLACOSA concur with Judge HANCOCK, JR.; Judge TITONE dissents and votes to affirm in a separate opinion.
*344 HANCOCK, JR., J.
In 1988, the Public Health Council, pursuant to the State Administrative Procedure Act, adopted a set of regulations (Medicaid Patient Access Regulations) which require new applicants seeking nursing home approval to agree that the home admit "a reasonable percentage of Medicaid patients". This admission standard is defined as 75% of the rate of Medicaid nursing home admissions in the county where the home is located; the standard is subject to change for a number of enumerated, or other, factors. In this litigation, the lower courts have declared the regulations to be invalid, essentially on two grounds:
(1) that the regulations go beyond the scope of the delegation of legislative power contrary to Boreali v Axelrod (71 N.Y.2d 1); and
(2) that, in any event, they constitute the establishment of a quota in violation of our decisions in Matter of Broidrick v Lindsay (39 N.Y.2d 641), Matter of Fullilove v Beame (48 N.Y.2d 376) and Subcontractors Trade Assn. v Koch (62 N.Y.2d 422).
For reasons to be explained, we disagree with the lower courts on both propositions. We, accordingly, reverse.

I
Respondent Public Health Council (PHC) is a body within the Department of Health charged with approving the establishment of all residential health care facilities (commonly known as nursing homes) within the State (Public Health Law § 2801-a et seq.). In 1986, the Department of Health issued a report concerning Medicaid patients' access to nursing homes based on an examination of historical data. The report concluded that "Medicaid patients often experience more difficulty than other patients in obtaining the health care services they require" and urged the development of regulations setting Medicaid admission standards. In 1987, the Department formed an Ad-Hoc Committee on Medicaid Access to further study the access issue. Following a series of open meetings and examination of additional data, the Ad-Hoc Committee concluded that "[s]ome facilities discriminate against Medicaid patients in their admission decisions" and recommended that the PHC adopt regulations to ensure fair access to nursing *345 homes for Medicaid patients. After considering the objections raised by the Office of Business Permits and Regulatory Assistance and conducting a public hearing, the PHC revised its proposed regulations and adopted the regulations now being challenged.
These regulations were set up as a benchmark to assure that nursing homes which voluntarily participate in the Medicaid program satisfy the public need. Specifically, the regulations provide that all applicants must agree to admit a "reasonable percentage of Medicaid patients", defined as "75 percent of the annual percentage of all residential health care facility admissions, in the long-term care planning area[1] in which the applicant facility is located, that are Medicaid patients" (10 NYCRR 670.3 [c] [2] [emphasis added]). They do not fix rigid minimums but set forth flexible standards (see, 155 AD2d, at 210). An applicant's admission rate may deviate from the standard based on various factors such as the facility's patient case mix (including the intensity of care required by the patients) (10 NYCRR 670.3 [c] [3] [iv]) and the financial impact on the facility due to an increase in Medicaid patient admissions (10 NYCRR 670.3 [c] [3] [v]). The regulations require an applicant to submit a written plan for reaching the Medicaid patient standard within two years, giving preference, if necessary, to Medicaid patients (10 NYCRR 670.3 [c] [4] [i]). A facility may, however, request an adjustment of its Medicaid patient admission standard based on the same factors which are permitted in 10 NYCRR 670.3 (c) (2) and (3), or any other factor (10 NYCRR 670.3 [c] [4] [ii]).
After its unsuccessful challenge to the regulations under State Administrative Procedure Act §§ 204 and 205, petitioner brought this litigation as an article 78 proceeding challenging the regulations as beyond the scope of the PHC's authority under Boreali v Axelrod (71 N.Y.2d 1, supra) and as an unauthorized quota. Supreme Court, Albany County, converted the article 78 proceeding into a declaratory judgment action and declared the regulations invalid. It noted that petitioner's Boreali claim "appear[s] prima facie to have merit", and characterized the regulations as "an affirmative action program which through a quota system requires that Medicaid patients be given favored treatment over private paying persons with respect to nursing home admission" (143 Misc 2d, at 872).
*346 In affirming Supreme Court, the Appellate Division, applied the four coalescing circumstances identified in Boreali, and concluded that (155 AD2d, at 211) "the challenged regulations exceeded the [PHC's] rule-making authority" and that the regulations constituted an unlawful "affirmative action plan" in favor of Medicaid recipients in violation of the statutory proscription contained in Public Health Law § 2801-a (9) (d). We granted PHC's motion for leave to appeal and now reverse.

II
In Boreali v Axelrod (supra), we held that the PHC over-stepped the line between administrative rule making and legislative policy making when it promulgated a comprehensive code regulating indoor smoking in areas open to the public. One year later, in Matter of Campagna v Shaffer (73 N.Y.2d 237, 243), we explained that "[a] key feature of [the Boreali] case * * * was that the Legislature had never articulated a policy regarding the public smoking controversy." (Emphasis added.) As the Court in Campagna expounded:
"Agencies, as creatures of the Legislature, act pursuant to specific grants of authority conferred by their creator. In discharging responsibilities, an agency is `clothed with those powers expressly conferred by its authorizing statute, as well as those required by necessary implication * * *. Where an agency has been endowed with broad power to regulate in the public interest, we have not hesitated to uphold reasonable acts on its part designed to further the regulatory scheme' * * *. It is correspondingly axiomatic, however, that an administrative officer has no power to declare through administrative fiat that which was never contemplated or delegated by the Legislature. An agency cannot by its regulations effect its vision of societal policy choices * * * and may adopt only rules and regulations which are in harmony with the statutory responsibilities it has been given to administer." (73 NY2d, at 242-243 [citations omitted].)
In this case, the PHC has adopted regulations designed to eliminate discrimination against Medicaid patients seeking access to nursing homes. The legislative authorization given to *347 the PHC to enact these regulations is broad. The Medicaid statute itself declares "[m]edical assistance for needy persons * * * to be a matter of public concern and a necessity in promoting * * * the state's goal of making available to everyone, regardless of * * * economic standing, uniform high-quality medical care" (Social Services Law § 363; see also, § 364 [2] [a] [to assure that the medical care and service rendered under the Social Services Law be properly rendered, the Department of Health "shall be responsible for establishing and maintaining standards (for nursing homes) pursuant to article twenty-eight of the public health law"]). Significantly, the Legislature has empowered the PHC, when it must decide whether to approve a nursing home for a particular area, to consider the public need in that area (see, Public Health Law § 2801-a [3]; see, Birnbaum v State of New York, 73 N.Y.2d 638, 644-645). In making a determination of public need the PHC is directed to take into account the medical needs of all members of the public and, in particular, the socioeconomic conditions in the area and the requirements of those on public assistance (see, Matter of Chambery v Axelrod, 101 AD2d 610).
These measures for assuring the provision of medical care to indigent persons, it must be noted, are part of a much-debated legislative enactment permitting profit-making business enterprises to engage in the furnishing of health care services (Public Health Law § 2801-a [9], added by L 1971, ch 722). There was opposition to the legislation as "a radical departure from the long-standing State policy of not permitting a medical facility to be operated as a commercial business corporation" (Mem in opposition dated June 25, 1971 from Attorney-General Lefkowitz, Bill Jacket, L 1971, ch 722) and concern that if profit-making institutions were permitted to furnish health services, they should be "required to serve the medically indigent, proportionately to the communities needs, [lest] an undue and impossible burden [be] added to the voluntary hospital system" (Letter of Hospital Association of New York State, May 10, 1971, Bill Jacket, L 1971, ch 722). Public Health Law § 2801-a (9) (d) effectively answers the concern that profit-making establishments, if permitted to furnish health services, might neglect the needs of Medicaid patients. In precise language, the statute provides that such institutions be permitted to operate only with the approval of the Public Health Council in accordance with the public need criteria of section 2801-a (3) and in compliance with the specific proviso that they "not discriminate because of * * * sponsor in admission *348 or retention of patients" (Public Health Law § 2801-a [9] [d] [emphasis added]).
These statutory provisions, taken as a whole, amount to an unmistakable legislative direction that the PHC should consider the adequacy of a facility's responsiveness to the nursing home care needs of Medicaid patients in approving a facility and take steps designed to prohibit nursing homes participating in the Medicaid program from discriminating against Medicaid patients in providing access to nursing home care. Thus, in this case, unlike Boreali, the basic policy decisions underlying the regulations have been made and articulated by the Legislature. Here, the Legislature, not the PHC, has chosen the ends to be accomplished: that participating nursing homes serve the needs of Medicaid patients and not discriminate against them in admission or retention. The choice of the appropriate means for achieving these ends, including the adoption of regulations, is well within the authority delegated to the agency for the purpose of administering the statute (see, Boreali v Axelrod, 71 NY2d, at 10-11, supra; Public Health Law § 2801-a [10] [a] [directing that the PHC "shall adopt * * * regulations * * * to effectuate the provisions and purposes" of the statute]).[2]
Even assuming that the legislative delegation of authority was proper, petitioner says it should prevail. It contends, and the courts below agreed, that the regulations are invalid because they create an improper "quota remedy" under this Court's decisions in Matter of Broidrick v Lindsay (39 N.Y.2d 641, supra), Matter of Fullilove v Beame (48 N.Y.2d 376, supra) and Subcontractors Trade Assn. v Koch (62 N.Y.2d 422, supra). We disagree.
This case is unlike Broidrick, Fullilove and Subcontractors *349 which involved executive-imposed affirmative action programs constituting "impermissible infringements upon the legislative power because they utilized a remedial device which, rather than implementing a legislative policy, enacted a new policy not embraced by the [Legislature]" (emphasis added; Under 21 v City of New York, 65 N.Y.2d 344, 358 and 356-357 [discussing Broidrick, Fullilove and Subcontractors]; see generally, Boreali v Axelrod, 71 NY2d, at 11, n 2, supra). Here, the Legislature not the PHC, has made the critical policy decisions: that socioeconomic conditions and the requirements of those on public assistance should be considered as a criteria for licensure and that facilities participating in the Medicaid program should be prohibited from discriminating because of sponsor. The PHC is unquestionably directed to implement these policies (see, supra, at 347-348).
The regulations involved here are not rules imposed by executive fiat without legislative sanction to effectuate some goal of social engineering (cf., City of Richmond v Croson Co., 488 US 469, 499, 502) but regulations duly adopted pursuant to the State Administrative Procedure Act for the purely practical purpose of attempting to make a legislative program work. As the legislative history demonstrates, the statutory provision prohibiting "sponsor" discrimination (see, Public Health Law § 2801-a [9]) merely reflects the legitimate concern that, in permitting for-profit corporations to provide nursing home care, the needs of the economically disadvantaged patients might not be adequately served (see, supra, at 347-348). Contrary to petitioner's contention, the regulations adopted here to effectuate defined legislative policy choices are not analogous to the sort of affirmative action programs for achieving broad social goals through the use of quotas employed in Broidrick, Fullilove and Subcontractors.

III
Petitioner also alleges that the regulations should be invalidated because they are irrational, essentially for two reasons. First, petitioner questions respondent's reliance on area Medicaid admission rates in setting the standards. Respondent relies on this area rate as an indicator of public need. To be sure, the regulations' use of three fourths of this rate as representing the need of Medicaid patients in a facility's area sets a standard that does not have absolute mathematical precision because it may reflect an unduly low rate if *350 discrimination against Medicaid patients prevails in a given area. But, such precision is not required. Reasonableness is the test and it is met here (see, Matter of City of New York v State of New York Commn. on Cable Tel., 47 N.Y.2d 89, 92-93). Second, petitioner argues that the regulations are irrational because they apply only to new applicant facilities and do not redress any discrimination by existing facilities. Merely because respondent has attempted to address part of a perceived concern, however, provides no basis for invalidating the regulations.
Finally, petitioner contends that the regulations, in effect, make a facility's participation in the Medicaid program involuntary because its license may be revoked for failure to comply with the regulations (see, 10 NYCRR 600.5 [a] [10]).[3] But, the regulations do not have that effect. First, there is no dispute that the law requires that a facility's participation in the Medicaid program must be voluntary (see, Matter of Daleview Nursing Home v Axelrod, 62 N.Y.2d 30, 32; Matter of Sigety v Ingraham, 29 N.Y.2d 110). Second, and of equal importance, the regulations provide that they apply only to voluntarily participating facilities (see, 10 NYCRR 670.3[c][1]). When a facility withdraws from the Medicaid system, therefore, it no longer is subject to the standards set forth in the regulations and obviously may not have its license revoked on the ground that it fails to comply therewith. The regulations in no way prohibit a facility from withdrawing from the Medicaid program (but cf., 10 NYCRR 401.3).

IV
In sum, the Medicaid Patient Access Regulations do not create rigid requirements or set-asides, but rather set forth standards which represent ideal norms subject to modification. The authority required to enact them is well within the scope *351 of power delegated to the PHC for effectuating the statutory proscription against sponsor discrimination and is in harmony with our established separation of powers doctrine. Accordingly, the order of the Appellate Division should be reversed, with costs, and the Medicaid Patient Access Regulations set forth in 10 NYCRR 600.5, 670.1 and 670.3 declared valid.
TITONE, J. (dissenting).
Today, this Court upholds the Public Health Council's (PHC) adoption of the Medicaid Patient Access Regulations (10 NYCRR 600.5, 670.1, 670.3), which require that newly established nursing homes participating in the Medicaid program agree to maintain a certain percentage of Medicaid patients as a condition of licensure. Because I, like the courts below, would conclude that the PHC, in promulgating those regulations failed to act within the bounds of its lawfully delegated authority and instead attempted to "effect its [own] vision of societal policy choices" (Matter of Campagna v Shaffer, 73 N.Y.2d 237, 242; see, Boreali v Axelrod, 71 N.Y.2d 1), I respectfully dissent.
While, like the majority, I realize that Medicaid patients in this State unfortunately often experience more difficulty in gaining admission to nursing homes than do private paying patients, I am unable to agree that the Legislature intended the PHC to have the power to address this problem through the adoption of a quota system, whereby the limited number of nursing home beds in this State would be rationed between Medicaid and non-Medicaid patients based on a formula devised by that agency. Such a decision, in my view, constitutes an inherently legislative determination that only the people's elected representatives can make.
Indeed, this case marks the first time that this Court has ever upheld the adoption of a broadly based quota remedy in the absence of a clear grant of authority from the Legislature (see, Subcontractors Trade Assn. v Koch, 62 N.Y.2d 422; Matter of Fullilove v Carey, 48 N.Y.2d 826; Matter of Fullilove v Beame, 48 N.Y.2d 376; Matter of Broidrick v Lindsay, 39 N.Y.2d 641). While our prior cases all concerned quotas established by the fiat of an elected executive (see, Boreali v Axelrod, 71 N.Y.2d 1, 11, n 2, supra), their underlying rationale  that the decision to adopt a quota remedy is itself a "fundamental policy-making" choice that only the Legislature can make (id., at 9)  is equally relevant in the present context. Thus, unless it may be concluded that the Legislature, either expressly or by necessary implication, intended to confer upon the PHC *352 the power to adopt such a remedy (see, Matter of Campagna v Shaffer, 73 N.Y.2d 237, 242, supra; Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 57 N.Y.2d 588, 595; see also, Subcontractors Trade Assn. v Koch, 62 N.Y.2d 422, 429, supra), this Court has no choice but to strike down the challenged regulations as ultra vires, no matter how necessary and beneficial the agency may perceive them to be.
The majority, relying principally on section 2801-a (3) (a) of the Public Health Law, holds that adoption of the challenged regulations was "well within" the authority delegated to the PHC. I cannot agree. That section, by its own terms, does nothing more than authorize the PHC to consider, on a case-by-case basis, "the public need for the existence of [an] institution at the time and place and under the circumstances proposed" before approving its establishment. There is no indication in the legislative history or otherwise that the section was, as the majority apparently concludes, intended by the Legislature to supply the PHC with broad powers to adopt whatever measures it deems necessary to "assure that nursing homes which voluntarily participate in the Medicaid program satisfy the public need." (Majority opn, at 345.)
Nor does the Legislature's decision to prohibit discrimination against Medicaid patients and its declaration that the providing of "[m]edical assistance for needy persons [is] a matter of public concern" (see, Public Health Law § 2801-a [9] [d];[1] Social Services Law § 363) supply a basis for inferring that the Legislature contemplated that the PHC would have the power to adopt a Medicaid quota system. As former Chief Judge Breitel stated in Matter of Broidrick v Lindsay: "There is a dramatic distinction between [an] expressed legislative policy of prohibiting * * * discrimination and * * * [a] policy of mandating * * * `percentages'" (39 N.Y.2d 641, 647, supra). Indeed, we have repeatedly stressed that the latter "cannot be viewed as merely one step further along [the] continuum" (Matter of Fullilove v Beame, 48 N.Y.2d 376, 378, supra).
Furthermore, the challenged regulations, in addition to establishing a new and different policy not authorized by the Legislature, actually conflict with the already existing policy that participation in the Medicaid program is completely voluntary and includes the right to withdraw at anytime *353 (Matter of Sigety v Ingraham, 29 N.Y.2d 110; Matter of Kaye v Whalen, 56 AD2d 111, affd 44 N.Y.2d 754; Matter of Blue v Whalen, 57 AD2d 240, lv denied 43 N.Y.2d 642). By providing that those nursing home operators who initially choose to participate in the Medicaid program but later decide to withdraw from it are subject to having their licenses revoked, the regulations, in effect, work to convert what was intended to be a voluntary program into a compulsory one.[2]
In sum, I would conclude that the PHC, in adopting the quota remedy implemented by the Medicaid Patient Access Regulations, has "leap[ed] well beyond th[e] legislative articulation"[3] of policy contained in section 2801-a (3) (a); (9) (d) and (10) (a),[4] and effected its own vision of societal policy choices over subjects not contemplated by the Legislature. Accordingly, I dissent.
Order reversed, etc.
NOTES
[1] Generally, the county where the facility is located.
[2] The remaining Boreali factors do not support an invalidation of the regulations. In Boreali the PHC constructed a regulatory scheme with exceptions based on socioeconomic and not health concerns when acting under its claimed authority to regulate in the field of public health. Additionally, the Boreali Court ruled that the special competence of the PHC in the field of health was not involved in the development of the regulations. In contrast, here, in enacting the challenged regulations, the PHC is specifically empowered to consider public need, which includes socioeconomic factors, in acting in this pervasively regulated nursing home industry (see, Birnbaum v State of New York, 73 N.Y.2d 638). Finally, we ascribe no particular significance to the legislative inaction in this case (see, Brooklyn Union Gas Co. v State Human Rights Appeal Bd., 41 N.Y.2d 84, 89-90; 41 Kew Gardens Rd. Assocs. v Tyburski, 70 N.Y.2d 325, 335; cf., Boreali v Axelrod, 71 N.Y.2d 1, 13).
[3] Petitioner contemplates harmful financial consequences if "forced" to comply with the regulations. Notably, the regulations permit consideration of financial factors in deciding whether a participating facility may deviate from the standard or whether the standard itself should be adjusted (see, 10 NYCRR 670.3 [c] [3] [v]; [4] [ii]). We add that, in a given case, if respondent fails to consider adequately a facility's claim of financial distress in a request to deviate from or to adjust the standard, a facility may challenge that determination as arbitrary, capricious or irrational in an article 78 proceeding. In order to protect Medicaid patients, the State may always adjust the standard so as to discourage a facility from exercising its right to completely opt out of the program. Also, if the Medicaid reimbursement rate set is insufficient, that, too, may be challenged.
[1] Although Public Health Law § 2801-a (9) (d) bars discrimination based upon "sponsor," the term "sponsor" would appear to include those patients whose medical needs are paid for by the Medicaid program.
[2] 10 NYCRR 600.5 (a) (10), in no uncertain terms, states that "[a]n approval of establishment may be revoked, limited or annulled by the Public Health Council if the council finds * * * that the established operator has failed to comply fully with any condition, limitation or other requirement imposed as part of, or in conjunction with, the approval of establishment" (emphasis added). In spite of the majority's conclusion to the contrary, there is absolutely no indication that the PHC intended this regulation not to apply to nursing home operators who voluntarily withdraw from the Medicaid program. While the majority relies upon 10 NYCRR 670.3 (c) (1), that section merely states that "[a]n application by an applicant that is or will be a provider that participates in the medical assistance (Medicaid) program shall not be approved unless the applicant agrees to comply with the requirements of this subdivision. An applicant that, at the time of consideration of its application by the Public Health Council, proposes not to participate in the Medicaid program may be approved, provided all other review criteria have been met" (emphasis added).
[3] Matter of Campagna v Shaffer (73 N.Y.2d 237, 243).
[4] Public Health Law § 2801-a (10) (a) authorizes the Public Health Council to adopt rules and regulations "to effectuate the provisions and purposes of [section 2801-a]."