OPINION OF THE COURT
Thomas W. Keegan, J.
Plaintiff, Cable Television Association of New York Inc. *323 (CTANY), commenced this declaratory judgment proceeding against defendant, New York State Commission on Cable Television, alleging that defendant misinterpreted section 812 (15) of the Executive Law, and that the defendant’s "Downgrade Regulations” are invalid due to lack of legislative authority. The defendant cross-moves for summary judgment dismissing the action. In the instant matter there are no disputed facts and therefore summary judgment is the appropriate remedy.
The issues in controversy are whether the implementation by cable television companies of a new "economy service option” constitutes a "network change” as defined by the provisions of chapter 9 of the Laws of 1990 (as amending Executive Law § 812 and enacting § 824-a) and whether the defendant acted beyond its authority in adopting "Downgrade Regulations”.
A brief review of the history of this regulatory legislation within the factual context of this litigation will clarify this court’s decision.
With the adoption of article 28 in 1972, the Legislature created a structure of dual governmental oversight and promotion of cable television services. Municipal governments were vested with direct control over cable television companies through the mechanism of municipal franchise contracts, including the authority to negotiate cable television service rates and to negotiate appropriate restraints on the pricing and marketing practices of cable television franchisees. A new State agency, the Commission on Cable Television (the defendant) was created to promote and encourage cable television development, to advise municipalities in franchise matters, and to set standards for municipal franchise award. Franchise contracts were required to be submitted to the Commission for compliance review. The Federal Government has also asserted concurrent and preemptive authority over cable television regulation. (Regulations of Federal Communications Commission, 47 CFR part 76; Cable Communications Policy Act of 1984, 47 USC §§ 521-559.) Since 1972, regulations of the Federal Communications Commission have prohibited State or municipal regulation of cable television service rates other than for "basic service” (47 CFR former 76.31; Cable Television Report and Order, 36 FCC2d 143, 219 [1972], reconsidered 36 FCC2d 326 [1972]), and in 1984 the Congress codified that prohibition in statute and broadened it to preclude regulation of any rates for the provision of cable service in locations *324 where the cable company faces "effective competition.” (47 use § 543 [b] [2] [A].)
Cable television companies now generally offer their customers a variety of optional program service packages, or service "tiers,” including a standard service package. As considered in this proceeding, "standard service” refers to a broad package of program services, or a tier or level of cable television service subscription, that is available for a fixed monthly price. Standard service usually includes local television broadcast station signals and the signals of several distant market television broadcast stations; the signals of a variety of non-broadcast television programs and services (e.g., The Weather Channel, Cable News Network, MTV music videos, ESPN: sports programming, and home shopping services); public affairs services (e.g., CSPAN and local community programs and public, government or educational access channels).
Premium service options, such as a single-channel movie service (e.g., Home Box Office or The Disney Channel, etc.), or single-product "pay-per-view” events (e.g., a major boxing match or concert), when selected, are added to the subscriber’s standard service.
Many cable television companies have also instituted an additional service option that is described herein as "economy service”. Economy service provides a limited package of channel offerings, usually including the channels carrying broadcast television stations and public affairs services such as locally originated programs and public and educational access channels. Economy service is made available to customers at a lower monthly charge than the standard or premium service. Cable operators often impose an installation charge for economy service which is referred to as a "downgrade charge”. When applied to a customer who previously had standard or premium service such a charge is restricted by the Downgrade Regulations that CTANY challenges in this proceeding.
Chapter 9 of the Laws of 1990 enacted amendments to article 28, by adding new definitions to section 812 and a new section 824-a, entitled "Consumer Protection”. Section 824-a requires, among other things, that cable television companies give regular notice to their customers of program offerings, and that special notices be given, and certain special compensating allowances and adjustments be offered, to affected customers when a program service is removed or deleted (a "network change”) from their service package. Section 812 *325 (15) defines a "network change” as follows: " 'Network change’ shall mean the removal of a network from a service tier whether or not added to another tier or a substantial alteration of the character of a network by a cable television company or an affiliate it controls. Notwithstanding the foregoing, the addition of a network to a service tier for promotional purposes where such purpose is clearly disclosed to the subscriber and is for a period of time not exceeding thirty-one days, the subsequent deletion of such network after the termination of the promotion, shall not be a 'network change’.”
In its order No. 90-230-A, the Commission stated that the introduction of economy service by a cable television company is a "network change” (whether or not a "downgrade charge” is assessed on those current customers who choose to subscribe to the new economy service) and therefore an event that triggers the full application of the provisions of section 824-a relevant to network changes.
In the same order of December 3, 1990 the Commission finalized its adoption of regulations concerning downgrade charges, which are referred to herein as the "Downgrade Regulations”. These rules included an amendment to 9 NYCRR 590.61 to add a new subdivision (h) to define "downgrade charge” and an amendment to 9 NYCRR 590.63 to add a new subdivision (f) to specify those instances when downgrade charges may be imposed and the maximum amount of such charges.
Section 590.61 (h) of the Commission’s Rules defines "downgrade charge” as "a charge imposed upon a subscriber for implementing a request by the subscriber for a change in service to a less expensive tier than the tier currently subscribed to”. (9 NYCRR 590.61 [h].) Section 590.63 (f) provides as follows:
"A cable television company may impose a downgrade charge upon the conditions and in the circumstances as follows:
"(1) subscribers have been notified of such charge in writing in at least 10-point type;
"(2) the charge does not exceed the cost of the downgrade to the company;
"(3) the downgrade is from a level of service which the subscriber has not maintained continuously for six months immediately preceding the date of the downgrade; and
"(4) the downgrade was not requested by a subscriber af *326 fected by a significant programming change or a network change within 45 days of receipt by the subscriber of the notice required by section 590.74 (b) (4) and (c) (4) of this Part.”
Paragraph (3) of this regulation amounts to a prohibition against imposing any charges for most downgrades. Paragraph (2) limits the amount of any allowable downgrade charge. Paragraph (4) was incorporated to implement the explicit requirements of chapter 9 and section 824-a (5) of article 28, and is not the subject of challenge herein. The provisions of this regulation other than paragraph (4) derive from a broader rule-making proceeding, which was initiated in 1989, prior to the enactment of chapter 9.
The power of a court to make a declaratory judgment arises out of, and is limited to determining the rights of persons which are actually controverted in a particular case pending before the tribunal (Matter of Hearst Corp. v Clyne, 50 NY2d 707; American Home Assur. Co. v Flushing Sav. Bank, 68 AD2d 170; Aetna Cas. & Sur. Co. v Merchant Mut. Ins. Co., 78 AD2d 176; Cutro v Sheehan Agency, 96 AD2d 669; Clearview Gardens Fourth Corp. v Michael, 110 Misc 2d 1022).
The plaintiff alleges defendant misinterpreted section 812 (15) of the Executive Law and that the defendant’s "Downgrade Regulations” are invalid.
First, the alleged misinterpretation of section 812 (15) of the Executive Law is unfounded. An agency’s interpretation of the statute under which it functions is " ' "entitled to the greatest weight” ’ ” (Matter of Coffey v Joy, 91 AD2d 923, 924) and " 'will be upheld if not irrational or irresponsible’ ” (Matter of Dental Socy. v New York State Tax Commn., 148 AD2d 791, 792, quoting Matter of John P. v Whalen, 54 NY2d 89, 95). Deference to an agency’s interpretation of a statute is particularly appropriate where the interpretation involves " 'knowledge and understanding of operational practices or entails an evaluation of factual data and inferences to be drawn therefrom’ ”. (Ansonia Residents Assn, v New York State Div. of Hous. & Community Renewal, 75 NY2d 206, 213.)
In the present case, Executive Law § 812 (15) defines network change as: "the removal of a network from a service tier whether or not added to another tier or a substantial alteration of the character of a network by a cable television company or an affiliate it controls. Notwithstanding the foregoing, the addition of a network to a service tier for promo *327 tional purposes where such purpose is clearly disclosed to the subscriber and is for a period of time not exceeding thirty-one days, the subsequent deletion of such network after the termination of the promotion, shall not be a 'network change’
A "network” is a channel or station, such as ESPN or CNN (§812 [13]). A "service tier” means "a category of cable television services or other services * * * for which a rate or fee is charged * * * including, but not limited to, basic services, premium networks [and] recurring pay-per-view services.” (§ 812 [14].) Further, the Legislature says of Executive Law § 812 (14) that "[i]t is the intent of this consumer protection legislation * * * to require that cable television companies provide complex and current rate and programming information on the basis of which subscription decisions can then be made” (see, L 1990, ch 9, § 1).
In the present case, the Commission’s interpretation of network change is rational. The offering of an economy service with fewer channels than premium service, and then dropping into this economy service what was once in premium service is in this court’s opinion within the definition of network change. This sort of manipulation of channels and thereby subscription rates is exactly what the Legislature has tried to prevent in its effort to protect the consumer.
The second allegation of the plaintiff that defendant lacked the authority to promulgate the "Downgrade Regulations” is likewise without merit. The test to be applied is set out in Matter of New York State Health Facilities Assn. v Axelrod (77 NY2d 340, 346) where the Court of Appeals held that where the Legislature has set the basic goals, a regulation promulgated in furtherance of the legislative objective must be upheld as a valid exercise of delegated authority if the regulation bears a reasonable relationship to the purposes of the enabling legislation (see also, Matter of Multiple Intervenors v Public Serv. Commn., 166 AD2d 140, 144). In enacting article 28 of the Executive Law, one of the goals of the Legislature is "to develop a State telecommunications policy; to promote the rapid development of the cable television industry responsive to community and public interest, and consonant with policies, regulations, and statutes of the federal government; and to assure the cable television companies provide adequate, economical, and efficient service to their subscribers” (Executive Law § 811 [Declaration of Legislative findings and intent]). To further this goal, the Legislature created the defendant, with authority to oversee development *328 of the cable television industry in New York State in accordance with a State-wide service plan (Executive Law § 814). The court finds that the Legislature gave the defendant a broad regulatory authority base and that the "Downgrade Regulations” are within such a base. There is also a sufficient nexus between this legislative empowerment base and the Downgrade Regulations to make these regulations reasonable.
Accordingly in view of the above the plaintiffs motion for summary judgment is denied. Defendant’s cross motion for summary judgment in this declaratory judgment action is granted.