OPINION OF THE COURT
Wesley, J.
 Petitioners, John and Janet Tamagni, contend that the New York State resident income tax (Tax Law art 22) violates the dormant Commerce Clause (US Const, art I, § 8) as applied to statutory residents of this State who claim another State as their domicile. Petitioners argue that, because New York gives no credit for resident income taxes paid to other States on investment income from intangible personal property, such as interest and stock dividends (so-called “intangible income”),[1] it *533 potentially subjects them to double taxation in violation of the Supreme Court’s “internal consistency” test (see, Container Corp. v Franchise Tax Bd., 463 US 159). In our view, the statute does not substantially affect interstate commerce and, therefore, the protections of the dormant Commerce Clause are not applicable. Even assuming arguendo that the Commerce Clause is implicated, the tax does not violate the dormant Commerce Clause because the tax does not facially discriminate against interstate commerce, and States have traditionally retained broad powers to tax their own residents.
I.
The Tamagnis are New Jersey domiciliaries, having resided at their current address in Summit, New Jersey, from 1979 through and including the tax years at issue — 1987, 1988 and 1989. Mr. Tamagni is an investment banker with the firm of hazard Freres. His office is in New York City; however, his work often requires him to travel throughout the country. The Tamagnis own and maintain an apartment in New York City, in addition to homes in New Jersey and New Hampshire. For each of the years at issue, petitioners filed nonresident income tax returns in New York. After a field audit, the New York State Department of Taxation and Finance concluded that the Tamagnis were statutory residents of New York because (1) Mr. Tamagni had not demonstrated that he spent fewer than 184 days in New York City and New York State, and (2) the couple maintained a permanent place of abode in New York (Tax Law § 605 [b] [1] [B]).[2] As a result, all of their income was subject to the State income tax.[3] The Department issued a Notice of Deficiency indicating that the Tamagnis owed an additional $192,541.22 in State and City income taxes, plus penalties and interest.
The Tamagnis petitioned the Department for a redetermination of the deficiency, asserting that they were not New York *534 residents for any of the periods at issue. After a hearing, an Administrative Law Judge (ALJ) concluded that petitioners had not established that they had spent fewer than 184 days in New York State for tax years 1988 and 1989, and in New York City for 1988.[4] Thus, the ALJ concluded that the Tamagnis were properly assessed as statutory residents for those periods only. The Tamagnis also challenged the constitutionality of the tax as applied to them. The ALJ viewed this as a facial challenge to the constitutionality of Tax Law § 620 (a) and concluded that he was without administrative jurisdiction to entertain such a facial challenge.
On appeal to the Tax Appeals Tribunal, the Tamagnis again argued that, as applied to them, the New York State definition of residence for income tax purposes discriminates against interstate commerce in violation of the dormant Commerce Clause, in that it subjects them to potential multiple taxation of intangible income. The Tribunal addressed this argument on the merits and rejected it. The Tribunal concluded that the taxpayers had not shown how they were engaged in interstate commerce simply by being domiciled in New Jersey while also being statutory residents of New York. Thus, the Tribunal concluded that the Commerce Clause was not applicable.
The Tamagnis then commenced a CPLR article 78 proceeding challenging the Tribunal’s determination, arguing that the residency tax violates the dormant Commerce Clause both facially and as applied to them.[5] After partially converting the proceeding to a declaratory judgment action, the Appellate Division confirmed the determination, concluding that the Commerce Clause was not implicated by the imposition of the tax, because neither commuting from New Jersey to New York to work, nor maintaining a permanent residence in New York, produced “the requisite effect on commerce” (230 AD2d 417, 420). Petitioners appealed as of right on constitutional grounds, and we now affirm.
II.
Under Tax Law § 605 (b) (1) (B), any person who maintains a permanent place of abode in this State, and spends in excess *535 of 183 days here, is deemed a resident for State income tax purposes.[6] This classification is significant because, while nonresidents are taxed only upon their New York source income (Tax Law § 631), residents are taxed upon their worldwide, income (Tax Law § 612).
Defining residency for income tax purposes is not a new problem. The current statute can be traced back to chapter 425 of the Laws of 1922, which first defined residence for tax purposes in terms of maintenance of a permanent place of abode in New York and presence in this State for seven months (see, Tax Law former § 350 [7]). At the time the statute was enacted the Income Tax Bureau noted in its memorandum in support of the legislation that, “[w]e have several cases of multimillionaires who actually maintain homes in New York and spend ten months of every year in those homes * * * but they * * * claim to be nonresidents” (Bill Jacket, L 1922, ch 425). The statutory residence provision serves the important function of taxing those “who, while really and [for] all intents and purposes [are] residents of the state, have maintained a voting residence elsewhere and insist on paying taxes to us as nonresidents” (id.). In short, the statute is intended to discourage tax evasion by New York residents. Indeed, the Tax Department’s memorandum in support of the 1954 amendment to the statute, which established the “more than one hundred eighty-three days” requirement, specifically states that the amendment was necessary to deal with “many cases of avoidance and * * * evasion” of income tax by New York residents (see, Mem of Dept of Taxation and Finance, 1954 NY Legis Ann, at 296).
The vast majority of States join New York in utilizing definitions of residency for income tax purposes that include another category of taxpayers in addition to domiciliaries.[7] In fact, by requiring both a permanent place of abode in this State, and presence for more than half of the year, New York’s definition of “resident” is far less expansive than some. For example, Iowa, Louisiana and Maryland define residents to include *536 people who maintain a permanent place of abode within the State, regardless of the amount of time actually spent within the State (see, Iowa Code § 422.4 [15]; La Rev Stat Annot 47:31 [1]; Md Code Annot, Tax-Gen § 10-101 [h]).
While residents are generally subject to income tax based upon their worldwide income, New York does provide a tax credit for income taxes paid by its residents to other States. In order to qualify for this credit, the tax imposed by the other State must be on income “derived therefrom” — i.e., earned in the other State (Tax Law § 620 [a]). As the accompanying regulations recognize, this provision protects residents actually engaged in interstate commerce from double taxation by ensuring that they are taxed only once upon income derived from interstate activities (see, 20 NYCRR 120.1 [a] [2]; 120.4 [d] [“the resident credit against ordinary tax is allowable for income tax imposed by another jurisdiction upon compensation for personal services performed in the other jurisdiction, income from a business, trade or profession carried on in the other jurisdiction, and income from real or tangible personal property situated in the other jurisdiction”]).
The credit is not generally available for intangible income because that income has no identifiable situs. Intangible income generally is not derived, at least directly, from the taxpayer’s efforts in any jurisdiction outside of New York, and cannot be traced to any jurisdiction outside New York. It is simply investment income, and under the long-recognized doctrine of mobilia sequuntur personam ([“(m)ovables follow the * * * person”] Black’s Law Dictionary 905 [5th ed 1979]), it is subject to taxation by New York as the State of residence (see, Maguire v Trefry, 253 US 12,16). However, where the taxpayer can show that intangible income is in fact derived from the taxpayer’s activities in a State other than New York, the taxpayer is entitled to the credit (20 NYCRR 120.4 [d] [credit allowed where the income is derived “from property employed in a business, trade or profession carried on in” another State]).
The Tamagnis do not challenge their status as New York residents nor do they claim that the Tax Law § 605 (b) (1) (B) definition of resident violates the Due Process Clause. They challenge the statute only on the ground that it subjects them to potential double taxation of their intangible income, because New York does not grant a credit for taxes on such income paid to other States.
The taxpayers assert that the Appellate Division applied an overly restrictive definition of interstate commerce in conclud *537 ing that the protections afforded by the dormant Commerce Clause do not apply here. As they correctly note, “ ‘[t]he definition of “commerce” is the same when relied on to strike down or restrict state legislation [under the dormant Commerce Clause] as when relied on to support some exertion of federal control or regulation’ ” (Camps Newfound / Owatonna v Town of Harrison, 520 US 564, 574, quoting Hughes v Oklahoma, 441 US 322, 326, n 2). Thus, if the tax at issue “substantially affects” interstate commerce (see, United States v Lopez, 514 US 549, 559) such that Congressional legislation limiting the State taxing power would be a valid exercise of its Commerce Clause powers, then the Commerce Clause is implicated.
Prior to Lopez (supra), the Supreme Court’s post New Deal Commerce Clause jurisprudence had expanded, almost without limit, the scope of activities deemed to affect interstate commerce. In Wickard v Filburn (317 US 111), for example, the Court upheld the application of the Agricultural Adjustment Act of 1938 to a farmer growing wheat for his own personal consumption. While Wickard may represent “the most far reaching example of Commerce Clause authority over intrastate activity” (United States v Lopez, supra, 514 US, at 560), the Supreme Court has shown little inclination to limit Congress’ powers as delineated by the Commerce Clause. Indeed, since Labor Bd. v Jones & Laughlin (301 US 1), the Court has upheld virtually all Federal enactments against challenges that they exceeded Congressional authority under the Commerce Clause. Of two notable exceptions in which the Court struck down Congressional legislation as exceeding its Commerce Clause authority (see, United States v Lopez, supra; National League of Cities v Usery, 426 US 833), one, Usery, was overruled nine years later (see, Garcia v San Antonio Metro. Tr. Auth., 469 US 528).
Nevertheless, as difficult as it may be to discern the outer boundary of Congressional power under the Commerce Clause, the Supreme Court has from time to time reiterated that such a boundary does exist. In Maryland v Wirtz (392 US 183, 196, overruled on other grounds National League of Cities v Usery, supra, overruled by Garcia v San Antonio Metro. Tr. Auth., supra) the Court stated that “the power to regulate commerce, though broad indeed, has limits” and that Courts have “ample power” to enforce those limits. The Court went on to point out that nowhere “has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad *538 general regulation of state or private activities” (id,., at 197, n 27). More recently, in United States v Lopez (supra), the Court struck down the Federal Gun-Free School Zones Act (18 USC § 922 [q]) as exceeding Congressional Commerce Clause authority. In doing so, the Court emphasized that Congressional authority to enact legislation regulating intrastate activities which “substantially affect” commerce is limited to economic activities (United States v Lopez, supra, 514 US, at 556).
Significantly, the Lopez Court also pointed to the lack of legislative findings to support the Congressional assertion of interstate commerce power (United States v Lopez, supra, 514 US, at 562-563). Similarly, in this case, the Tamagnis have not shown any demonstrable impact on an identifiable interstate market which would warrant the conclusion that this tax substantially affects interstate commerce.
The New York income tax is based upon a taxpayer’s resident status, without regard to any specific commercial or economic transaction or activity. While the dissent points to the fact that Mr. Tamagni is engaged in interstate commerce in that he commutes daily from New Jersey, works as an investment banker in New York, and is involved in numerous economic activities while in New York, the income tax is imposed without regard to his commute, or the specific nature of his activities in this State. It is imposed solely based upon his presence and maintenance of a permanent place of abode in New York, without regard to any economic activities incidental to his presence here. Indeed, the fact that commuters who do not own or lease property in New York are not subject to this tax demonstrates that the tax is completely indifferent to the interstate activities which the Tamagnis claim, in conclusory fashion, are affected. Thus, in our view, the interstate Commerce Clause is not implicated by the New York income tax.
Despite our conclusion that the Commerce Clause has no application to the statute at issue, we will proceed under the assumption that Congressional legislation limiting the State’s ability to tax nondomiciliary residents would be upheld given the expansive scope of the Supreme Court’s Commerce Clause jurisprudence (see, Moore, State and Local Taxation: When Will Congress Intervene?, 23 J Legis 171; Note, “Resident” Taxpayers: Internal Consistency, Due Process, and State Income Taxation, 91 Colum L Rev 119).
Even if Congressional power is assumed, this is far from determinative. Indeed, while it does dictate some level of *539 dormant Commerce Clause scrutiny, it does not dictate the degree or method of that scrutiny. While the definition of commerce is the same whether the question is Congressional authority or limitation of a State’s ability to legislate under the Commerce Clause, the validity of State legislation in the absence of Congressional action is ultimately an entirely different question than what subjects are within the reach of Congressional power (see, United States v Lopez, supra, 514 US, at 568-569 [Kennedy, J., concurring]). It is to this question — the validity of the State statute in the absence of Congressional action — that we now turn.
III.
The Commerce Clause provides that “[t]he Congress shall have Power * * * [t]o regulate Commerce * * * among the several States” (US Const, art I, § 8, cl [3]). On its face, the Clause is simply an affirmative grant of power to Congress, imposing no freestanding limitation on State power. Nonetheless, the Clause has long been read to contain, in addition to the affirmative grant of Federal power, a limitation upon State legislation as well. However, as previously noted, the two are not coextensive. That Congress has the power to regulate whatever may “substantially affect” interstate commerce does not mean that the States are without power to regulate in a manner which affects interstate commerce. Rather, in keeping with the original intent of the Commerce Clause to prevent the type of “economic Balkanization” which characterized the early Confederation (Hughes v Oklahoma, supra, 441 US, at 325) the negative, or dormant, Clause invalidates only State measures which “unjustifiably * * * discriminate against or burden the interstate flow of articles of commerce” (Oregon Waste Sys. v Department of Envtl. Quality of Ore., 511 US 93, 98).
Thus, “the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it ‘regulates evenhandedly with only “incidental” effects on interstate commerce, or discriminates against interstate commerce’ * * *. As we use the term here, ‘discrimination’ simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter” (id., at 99, quoting Hughes v Oklahoma, supra, 441 US, at 336). If there is no differential treatment of identifiable, similarly situated in-State and out-of-State interests, there is no dormant Commerce Clause violation.
There is little guidance in Supreme Court opinions as to how to resolve this threshold inquiry. As the Supreme Court *540 recently noted in General Motors Corp. v Tracy (519 US 278, 299), this initial inquiry “has more often than not itself remained dormant in this Court’s opinions on state discrimination subject to review under the dormant Commerce Clause.” One principle that must be kept in mind, however, is that “[t]he dormant Commerce Clause protects markets and participants in markets, not taxpayers as such” (supra, 519 US, at 300).
Thus, contrary to the dissent’s contention, the first step in the dormant Commerce Clause inquiry is not simply to apply the so-called Complete Auto test (Complete Auto Tr. v Brady, 430 US 274), including its “internal consistency” requirement (Container Corp. v Franchise Tax Bd., supra).[8] Rather, the first step is to identify the interstate market that is being subjected to discriminatory or unduly burdensome taxation.[9] This requires, at the outset, identification of the similarly situated in-State and out-of-State interests which the tax treats differently. In “the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply” (General Motors Corp. v Tracy, supra, 519 US, at 300). Because the tax at issue does not operate to the disadvantage of any identifiable interstate market, but rather simply taxes residents based on their status as residents, it does not violate the dormant Commerce Clause. The fact that it may have “incidental effects” on interstate *541 commerce is not sufficient to prove a violation of the dormant Commerce Clause (Oregon Waste Sys. v Department of Envtl. Quality of Ore., supra, 511 US, at 99; see also, Fulton Corp. v Faulkner, 516 US 325, 331).
The Tamagnis claim that the tax is discriminatory because it subjects statutory residents to potential double taxation which New York domiciliaries residing solely in New York do not face. However, statutory residents domiciled in another State are not similarly situated to New York domiciliaries. The former enjoy the privileges and protections of another State, and may therefore be subject to taxation by that State, which the latter do not. Moreover, regardless of the effects of the tax visá-vis different classes of taxpayers, the Tamagnis can identify no interstate market which is significantly impacted by the allegedly discriminatory tax.
The Tamagnis also claim that interstate commerce is affected here because Mr. Tamagni commutes to work in New York, thus implicating the interstate labor market, and because the tax is imposed based in part upon the purchase or lease of New York property by an out-of-State resident. However, the potential double taxation of which the Tamagnis complain bears no relation to either activity. The tax is not assessed against the interstate labor market per se; indeed, it is based solely upon the taxpayer’s presence in New York. The potential effects of the tax on the interstate labor market (no actual effects have been demonstrated) are incidental at best.
The fact that nondomiciliaries who commute to New York and own or lease property here are potentially subject to the resident income tax, while nondomiciliaries who do not own or lease property in New York are not, does not support any claim of discrimination or undue burden upon interstate commerce since the basis for the imposition of the tax as it relates to these classes of taxpayers (i.e., maintenance of a permanent place of abode in New York) “does not give rise to conflicting regulation of any [interstate] transaction or result in malapportionment of any tax” on an interstate activity (General Motors Corp. v Tracy, supra, 519 US, at 299, n 12). The purpose of the apportionment requirement is to assure that interstate activities are not improperly burdened by multiple taxation (id). The possible effect, if any (and again no actual effect has been shown) on the New York real estate market represents a quintessentially local, rather than interstate, concern. Thus, because the potential double taxation does not fall on any identifiable interstate market, it does not *542 favor intrastate commerce over interstate commerce in a manner violative of the dormant Commerce Clause.
The lack of any discrimination against an interstate market here may perhaps best be shown by comparison to an example of an intangible income tax which was held to be discriminatory. In Fulton Corp. v Faulkner (supra), the Court considered the validity of a North Carolina personal income tax on intangibles. The tax was assessed against the intangible income received by individuals at a rate inversely proportional to the underlying corporation’s liability for North Carolina franchise taxes. This had the effect of taxing dividends from inState corporations less than dividends from out-of-State corporations.[10] The effect on an interstate market in such a case is obvious, and is more than incidental. In this case, by contrast, there is no similar differential treatment of intrastate and interstate commercial interests. Indeed, this tax on its face does not apply to any interstate market whatsoever; it is a tax on residents based on their status as residents. There is simply no similarly situated out-of-State interest to compare to an in-State resident for purposes of applying a dormant Commerce Clause analysis. The Tamagnis were taxed for being New York residents and not for their interstate activities.
Even if the Complete Auto test were implicated here, as the dissent contends, it would not alter our conclusion that the tax at issue is constitutional. Petitioners argue, and the dissent agrees, that the tax violates the Complete Auto test because it is not “ ‘internally consistent’ ” (dissenting opn, at 548 [citing Container Corp. v Franchise Tax Bd., 463 US 159, 169, supra; Goldberg v Sweet, 488 US 252, 261]). The internal consistency test is not a freestanding constitutional requirement, but is merely a tool for assessing the fair apportionment and nondiscrimination prongs of the Complete Auto test. It comes into play when the same interstate activity crosses State lines and *543 is subject to tax in more than one State (see, Goldberg v Sweet, supra, at 261).
The fair apportionment requirement of Complete Auto (supra), however, is not violated when the incidences of the tax fall on a separable local occurrence as opposed to an interstate activity, even where the local occurrence is part of a greater continuum that makes up an interstate transaction (see, Oklahoma Tax Commn. v Jefferson Lines, 514 US 175, 187-188 [“the Commerce Clause does not forbid the actual assessment of a succession of taxes by different States on distinct events as the same tangible object flows along”]). In Oklahoma Tax Commn. v Jefferson Lines, the Supreme Court held that the full price of an interstate bus ticket may be taxed in the State where travel originates, despite the fact that the service provided, and taxed, extends into other States (see, id., at 187-192; see also, Colonial Pipeline Co. v Traigle, 421 US 100 [corporation franchise tax fairly apportioned as it taxes the incidence of actually doing business as a corporate entity in Louisiana]; Western Live Stock v Bureau, 303 US 250, 258 [business of printing and preparing a magazine distinct from circulation]). Here, the tax does not fall on any interstate activity, but rather on a purely local occurrence — the taxpayer’s status as a resident of New York State.
“[T]he question is whether the State has exerted its power in proper proportion to [the challenger’s] activities within the State and to [its] consequent enjoyment of the opportunities and protections which the State has afforded” (General Motors v Washington, 377 US 436, 441). New York has determined that the taxpayers who spend an inordinate amount of time and maintain a permanent abode here should be taxed accordingly. There is no need to apportion the tax because the incidences of the tax — the time petitioner spends in New York and the maintenance of a permanent abode in this State — both occur entirely within New York.
State universal income taxation of residents is justified by the protections and services which the State affords its residents and which residents, through contacts with the State sufficient to classify them as residents, are privileged to enjoy (see, New York ex rel. Cohn v Graves, 300 US 308). Thus, any claim of facial discrimination is belied by the very nature of the tax; since only New York may tax the income of its residents on the basis of their status as New York residents, there is no danger of another jurisdiction imposing a tax on the Tamagnis as New York residents (see, Oklahoma Tax Commn. v Jefferson Lines, supra, 514 US, at 186-187).
*544 Moreover, while universal income taxation is justified by the protections and services provided by the State of residency, neither due process nor the Commerce Clause requires that the tax bear an exact relation to the services actually provided to the individual taxpayer. If the law were otherwise, all similar taxes would be unconstitutional as currently imposed, since they inherently impose a larger burden upon those with higher incomes, without regard to the level of services utilized. It has long been recognized that “[a] tax measured by the net income of residents is an equitable method of distributing the burdens of government among those who are privileged to enjoy its benefits” (New York ex rel. Cohn v Graves, supra, 300 US, at 313). Thus, the Tamagnis’ claim that they should not be subject to tax on all of their income in this State because they also spend substantial amounts of time in another State and are subject to taxation there is without merit. The New York income tax operates to tax residents as residents of this State, without regard to their activities in other States; so long as the State’s definition of resident does not violate due process (and there is no claim here that it does), no violation of the dormant Commerce Clause is apparent.
IV.
The inapplicability of dormant Commerce Clause analysis to State resident income taxation is further supported by both historical precedent and the fundamental State sovereignty interest at stake. The Supreme Court has long held that multiple taxation of State residents is not forbidden (see, State Tax Commn. v Aldrich, 316 US 174; New York ex rel. Cohn v Graves, supra; Fidelity & Columbia Trust Co. v Louisville, 245 US 54). While this line of cases involved due process challenges, the very fact that the dormant Commerce Clause was never mentioned as a limitation on State power to tax resident income suggests that there is no such limitation. Indeed, in Goldberg v Sweet (488 US 252, 266, supra) the Supreme Court stated that “[i]t is not a purpose of the Commerce Clause to protect state residents from their own state taxes.”
Furthermore, we can conceive of no power more fundamental to the operation of a sovereign State than the power to tax its own residents. In National League of Cities v Usery (supra) the Supreme Court recognized the importance of certain fundamental attributes of State sovereignty, and held that such interests may check even the power of Congress to assert its Commerce Clause power. While Garcia v San Antonio Metro. Tr. Auth. *545 (supra) overruled Usery insofar as the affirmative Commerce Clause power of Congress is concerned, it seems to us entirely appropriate to give the principles of federalism enunciated in Usery weight in assessing the scope of limitations on State taxing power in the absence of Congressional action. Congress itself has recognized that “the right of States to raise revenues in a manner of their own choosing [is] an essential element of a strong and vibrant Federal system” (Limitation on State Taxation of Certain Pension Income, HR Rep No. 776, 103d Cong, 2d Sess 12-13).
Indeed, Congress apparently has a self-imposed higher threshold for exercising its Commerce Clause authority to limit “the right of States to tax economic activities within their borders” (To Clarify State Authority to Tax Compensation Paid to Certain Employees, HR Rep No. 203, 105th Cong, 1st Sess 2). Recently enacted legislation provides evidence of the deference Congress has chosen to give States in taxing residents. By Public Law 104-95 Congress eliminated the ability of States to tax the pension income of nonresident retirees. The legislation provides that “[n]o State may impose an income tax on any retirement income of an individual who is not a resident or domiciliary of such State (as determined under the laws of such State)” (4 USC § 114 [a] [emphasis added]). Thus, in enacting this very limited restriction on State taxing authority, Congress explicitly deferred to State definitions of residency. This evidences a clear current Congressional intent to insulate State taxation of residents from Federal scrutiny.
Thus, inasmuch as the ability of a State to tax its own residents is undoubtedly a “traditional aspect! ] of state sovereignty” (National League of Cities v Usery, supra, 426 US, at 849) historical precedent and fundamental principles of federalism provide further support for our conclusion that the New York resident income tax is not unconstitutional, either on its face, or as applied to these taxpayers.
Accordingly, the judgment of the Appellate Division should be affirmed, with costs.

. “Income from intangible personal property” is defined by Tax Department regulations as “[i] terns of income, gain, loss and deduction attributable to intangible personal property * * * including annuities, dividends, inter *533 est, and gains and losses from the disposition of intangible personal property” (20 NYCRR 132.5 [a]).

. Tax Law § 605 (b) (1) (B) provides that a “resident individual” includes one “who is not domiciled in this state but maintains a permanent place of abode in this state and spends in the aggregate more than one hundred eighty-three days of the taxable year in this state”. New York City imposes a similar tax on City residents (see, Administrative Code of City of NY § 11-1705 [b]). Because the City Code provision precisely mirrors Tax Law § 605 (b) (1) (B), for simplicity sake this opinion will refer only to the Tax Law provisions.

. The Tamagnis had New York State taxable income of $1,740,897 for 1987, $2,127,838.20 for 1988 and $1,807,928.50 for 1989.

. Because Mr. Tamagni spent a number of days in 1989 in parts of New York State outside New York City he qualified as a State resident for that year but the time he spent in New York City fell below the 184-day residency threshold.

. The Tamagnis also raised a State constitutional claim that is not pursued before this Court.

. Under Tax Department regulations, when a person is present “within New York State for any part of a calendar day,” that day counts toward the 184-day residency threshold (20 NYCRR 105.20 [c]). The validity of this regulation is not challenged here.

. By one commentator’s count, “[o]nly Massachusetts, New Mexico, South Carolina, and Wisconsin limit their definition of resident to include domiciliaries alone” (Note, “Resident” Taxpayers: Internal Consistency, Due Process, and State Income Taxation, 91 Colum L Rev 119, 122, n 19).

. A tax passes the Complete Auto test if it is “applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.” (Complete Auto Tr. v Brady, supra, 430 US, at 279.) The Supreme Court has sometimes applied the internal consistency test in determining whether the tax is fairly apportioned and discriminates against interstate commerce. A tax fails the internal consistency test if, were the same tax imposed by another State, multiple taxation would result (Container Corp. v Franchise Tax Bd., supra).

. It is unclear whether the claim here is that the tax discriminates against or unduly burdens interstate commerce. The dissent contends that the issue is whether the tax is unduly burdensome, regardless of its discriminatory impact. The Tamagnis, however, appear to argue that the tax “discriminates against” interstate commerce (see, petitioner’s reply brief, at 2). As the Supreme Court noted in General Motors Corp. v Tracy (supra, 519 US, at 298, n 12) there is “no clear line between these two strands of analysis” and for present purposes, at least, the distinction is unimportant.

. The North Carolina franchise (or corporate income) tax is typical of that imposed by many States. It imposes a tax upon a corporation’s income earned within the State. Because of the difficulties of apportioning the income of an integrated interstate and international corporation, States typically utilize a unitary business apportionment formula which “calculates the local tax base by first defining the scope of the ‘unitary business’ of which the taxed enterprise’s activities in the taxing jurisdiction form one part, and then apportioning the total income of that ‘unitary business’ between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation’s activities within and without the jurisdiction” (Container Corp. v Franchise Tax Bd.., supra, 463 US, at 165).