[34 NYS3d 232]

In the Matter of National Restaurant Association, Appellant, v Commissioner of Labor et al., Respondents.

Third Department, June 9, 2016

**APPEARANCES OF COUNSEL**

*Gibson, Dunn & Crutcher LLP*, New York City (*Randy M. Mastro* of counsel) and *Thomas H. Dupree Jr.*, Washington, D.C., pro hac vice, for appellant.

*Eric T. Schneiderman, Attorney General*, Albany (*Andrea Oser* of counsel), for Commissioner of Labor, respondent.

*Gladstein, Reif & Meginniss, LLP*, New York City (*James Reif* of counsel) and *Altshuler Berzon LLP*, San Francisco, California (*Michael Rubin* of counsel), for Alvin Major and others, respondents.

*Littler Mendelson, PC*, Washington, D.C. (*Joshua B. Waxman* of counsel), for National Federation of Independent Business and another, amici curiae.

*Harwood Law PLLC*, New York City (*Anthony Harwood* of counsel), for Greater New York Chamber of Commerce and others, amici curiae.

*Paul Sonn, National Employment Law Project*, New York City (*Laura Huizar*, Washington, D.C., of counsel) and *Meyer, Suozzi, English & Klein, PC*, New York City, for National Employment Law Project and others, amici curiae.

**OPINION OF THE COURT**

DEVINE, J.

Appeal from a determination of the Industrial Board of Appeals, filed December 9, 2015, which confirmed a minimum wage order issued by respondent Commissioner of Labor increasing the cash wage paid to certain food service workers.

Respondent Commissioner of Labor issued a determination on May 7, 2015 opining "that a substantial number of fast food workers . . . are receiving wages insufficient to provide adequate maintenance and to protect their health," and stating his intent to "appoint a wage board to inquire into and report and recommend adequate minimum wages and regulations for" those workers (*see* Labor Law § 653 [1]). The Commissioner proceeded to name a three-member wage board with one representative each for the interests of employers, employees and the general public (*see* Labor Law § 655 [1]). After conducting several public hearings and receiving an array of written submissions, the wage board issued a July 2015 report recommending that the minimum wage for fast-food workers be increased. The wage board suggested a gradual phase-in of the increase, which would take full effect on December 31, 2018 in New York City and July 1, 2021 elsewhere in the state. The recommended increase was additionally limited to fast-food workers employed by fast-food establishments in New York that were part of a chain with at least 30 "establishments nationally," including those operating under a franchise agreement where the franchisor "owns or operate[s]" at least 30 such "establishments in the aggregate nationally."

In September 2015, the Commissioner accepted the report in full and ordered that the recommended minimum wage increase be implemented (*see* Labor Law § 656). Petitioner thereafter appealed to the Industrial Board of Appeals (hereinafter IBA), asserting that the wage order issued by the Commissioner was "contrary to law" (Labor Law § 657 [2]).[1] The IBA disagreed and confirmed the wage order, and petitioner now appeals to this Court (*see* Labor Law § 657 [2]).

■ We consider at the outset whether the 2016 enactment by the Legislature of a gradual increase in the statutory minimum wage to $15 an hour—the rate of increase dependent upon factors such as the location of the employees, the size of the employer and the state of the economy—has rendered this appeal moot (*see* Labor Law § 652 [1], as amended by L 2016, ch 54, § 1, part K, § 1; *see also Matter of Grand Jury Subpoenas for Locals 17, 135, 257 & 608 of United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 72 NY2d 307, 311 [1988], *cert denied* 488 US 966 [1988] ["mootness is a doctrine related to subject matter jurisdiction and . . . must be considered by the court *sua sponte*"]). In raising the statutory minimum wage, the Legislature stripped the Commissioner of his authority to appoint a wage board and establish a minimum wage for an occupation "that exceeds the highest rate listed in [Labor Law § 652 (1)] as amended . . . prior to such rate becoming effective" (L 2016, ch 54, § 1, part K, § 4).[2] The Legislature recognized that existing wage orders would remain in effect, however, and permitted the Commissioner to "smooth wages and modify an existing wage order to conform with" the gradual increase in the statutory minimum wage (L 2016, ch 54, § 1, part K, § 5).[3] The Legislature further prevented the Commissioner from modifying an existing wage order in a manner that

---

1. Labor Law § 657 (2) refers to a "review before the board of standards and appeals." The IBA replaced that body in 1975 and assumed its "functions, powers and duties" except for those explicitly transferred to the Commissioner (L 1975, ch 756, § 21).

2. The Legislature first authorized the Commissioner to convene wage boards and establish minimum wages on an industry-by-industry basis in 1937 (*see* L 1937, ch 276). The separate statutory minimum wage, applicable to workers statewide, was established in 1960 (*see* L 1960, ch 619). Governor Rockefeller noted at that time that New York could look forward to enjoying "the simplicity of a statutory minimum wage with the desirable flexibility of the industry-by-industry wage board procedure" (Governor's Mem approving L 1960, ch 619, 1960 McKinney's Sess Laws of NY at 2032).

3. Petitioner advises us that it has inquired, without response, as to whether the Commissioner intends to exercise his "smoothing" authority

reduced "a worker's wages," and fast-food workers subject to the wage order here are presently entitled to a higher minimum wage than other employees (L 2016, ch 54, § 1, part K, § 5). The wage order accordingly remains viable and has impacts distinct from those wrought by the increase in the statutory minimum wage, and the present appeal has not "become moot by passage of time or change in circumstances" (*Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714 [1980]).

We must also, before reaching the various arguments of petitioner and amici curiae, address the scope of our review. Labor Law § 657 (1) states that "[t]he findings of the [C]ommissioner as to the facts shall be conclusive on any appeal from a[ ]" wage order. The IBA assesses whether a wage order is "contrary to law" (Labor Law § 657 [2]) and, while the statute is presently silent as to the scope of our review, there is little question that it is similar (*see* L 1944, ch 705, § 1; L 1942, ch 693, § 1; *Matter of New York State Rest. Assn., Inc. v Commissioner of Labor*, 45 AD3d 1133, 1135-1136 [2007], *lv denied* 10 NY3d 703 [2008]; *Matter of Wells Plaza Corp. [Industrial Commr. of State of N.Y.—New York Hotel Trades Council AFL-CIO]*, 10 AD2d 209, 212-213 [1960], *affd* 8 NY2d 975 [1960]).[4] Petitioner is therefore entitled to argue that the wage order "is contrary to some provision of the [F]ederal or [S]tate [C]onstitution or laws, or [that] it is beyond the power granted to the [Commissioner], or [that] it is based on some mistake of law" (*People ex rel. New York & Queens Gas Co. v McCall*, 219 NY 84, 88 [1916], *affd* 245 US 345 [1917] [internal quotation marks and citation omitted]). Petitioner is also free to claim that findings of fact constitute an error of law in that they are unsupported by a rational basis in the record (*see Matter of Kiame-*

with regard to the wage order here. The Commissioner is presumably well aware of that authority—which, in any event, would not have an effect on the increase in the minimum wage already granted to fast-food workers—and we decline the invitation made by petitioner at oral argument to remit this matter so that the Commissioner may continue to mull over whether he should exercise it.

4. The predecessor to the IBA was permitted to develop the record and consider whether the wage order was unreasonable, but the IBA is now directed to rely "upon the record certified and filed by the [C]ommissioner" and assess whether the wage order "is contrary to law" (Labor Law § 657 [2]; *see Matter of Lodging House Keepers Assn. of N.Y. v Catherwood*, 18 AD2d 725, 725 [1962]). Outside of the wage order context, the IBA remains empowered to develop the record and revoke, amend or modify an order of the Commissioner if it "is invalid *or* unreasonable" (Labor Law § 101 [3] [emphasis added; *see* Labor Law § 100 [5]).

*sha Concord v Catherwood*, 28 AD2d 275, 279 [1967]; *Matter of Kiamesha Concord, Inc. v Lewis*, 15 AD2d 702, 703 [1962]; *see also Matter of Colton v Berman*, 21 NY2d 322, 329 [1967]). If a rational basis exists for the findings of fact, however, they are "conclusive" and beyond our review (Labor Law § 657 [1]; *see Matter of Wells Plaza Corp. [Industrial Commr. of State of N.Y.—New York Hotel Trades Council, AFL-CIO]*, 10 AD2d at 214). With those principles in mind, we turn to the arguments advanced by petitioner and supported by certain amici curiae. Inasmuch as we are uniformly unpersuaded by those arguments, we affirm.

Petitioner first contends that the issuance of the wage order violates the separation of powers doctrine, and "[a] typical point of dispute in this area is the [L]egislature's delegation to an agency of the authority to administer . . . a statute as enacted by the [L]egislature" (*Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 27 NY3d 174, 178 [2016]). In determining whether an agency has usurped the authority of the legislative branch, relevant guidelines

> "to be considered are whether (1) the agency did more than balance costs and benefits according to preexisting guidelines, but instead made value judgments entailing difficult and complex choices between broad policy goals to resolve social problems; (2) the agency merely filled in details of a broad policy or if it wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance; (3) the [L]egislature has unsuccessfully tried to reach agreement on the issue, which would indicate that the matter is a policy consideration for the elected body to resolve; and (4) the agency used special expertise or competence in the field to develop the challenged regulation" (*id.* at 179-180 [internal quotation marks, citations and brackets omitted]; *see Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d 600, 610-612 [2015]).

The Commissioner is tasked with making complex economic assessments in issuing a wage order, but has special expertise to do so in the form of investigative powers in the area of wages and leadership of an agency capable of providing expert guid-

ance (see Labor Law §§ 196, 653, 655, 660). Moreover, even a cursory review of the enabling statutes reveals that "the basic policy decisions underlying [wage orders were] made and articulated by the Legislature" (*Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d 340, 348 [1991]). The Commissioner is authorized to investigate whether the wages paid to employees "in any occupation or occupations . . . are sufficient to provide adequate maintenance and to protect the health of the persons employed in such occupation," as well as to empanel a wage board "to inquire into and report and recommend adequate minimum wages and regulations for employees in such occupation or occupations" as a prelude to the issuance of a wage order (Labor Law § 653 [1]). Labor Law § 654 more fully sets forth the factors to be considered in that analysis, directing that "the wage board and the [C]ommissioner shall consider the amount sufficient to provide adequate maintenance and to protect health and, in addition, . . . the value of the work or classification of work performed, and the wages paid in the state for work of like or comparable character." Limits are then placed on any recommendation offered by the wage board, with Labor Law § 655 (5) (a) directing that the recommended minimum wage "shall not be in excess of an amount sufficient to provide adequate maintenance and to protect the health of the employees." The statute further prohibits the wage board from recommending an amount below the floor set by the statutory minimum wage and defines the limits of the wage board's power in other respects (see Labor Law § 655 [5] [a]).

■ The Commissioner is accordingly authorized to make the assessment as to whether the minimum wage should be increased for employees in specific occupations, does so with help from an agency having special competence in the area and a wage board tasked with investigating the relevant questions as set forth by the Legislature, and thereafter issues a wage order setting a minimum wage in a specific occupation if such would further the policy objectives delineated by statute. The Commissioner complied with that procedure, and the fact that the Legislature failed to agree on an increase in the statutory minimum wage in the lead-up to the issuance of the wage order in no way reflects dispute or confusion as to the longstanding authority of the Commissioner to set a minimum wage for employees in a given occupation (see *Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic*

*Preserv.*, 27 NY3d at 183-184).[5] Petitioner also takes issue with various provisions in the wage order but, suffice it to say, they amount to choices involving "the appropriate means for achieving [statutorily defined] ends . . . [which fall] well within the authority delegated to the [Commissioner] for the purpose of administering the statute" and do not offend the separation of powers doctrine (*Matter of New York State Health Facilities Assn. v Axelrod*, 77 NY2d at 348; *see Matter of Rainbow Beach Assn. v New York State Dept. of Health*, 187 AD2d 891, 893 [1992]). Thus, the Commissioner "acted within the confines of that delegated power and did not usurp the authority of the [L]egislature by" issuing the wage order (*Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv.*, 27 NY3d at 185).

Petitioner also argues that the order runs afoul of Congress' power to "regulate [c]ommerce . . . among the several [s]tates" (US Const, art I, § 8, cl 3). The grant of power to Congress implies a corollary limitation on state power known as the dormant Commerce Clause, which "prohibits economic protectionism [by the states]—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors" (*New Energy Co. of Ind. v Limbach*, 486 US 269, 273-274 [1988]; *see Comptroller of Treasury of Md. v Wynne*, 575 US —, —, 135 S Ct 1787, 1794-1795 [2015]). The wage order purportedly offends the dormant Commerce Clause in that it targets fast-food chains with 30 or more locations "nationally" to the exclusion of fast-food chains of similar size located solely within New York. The wage order, however, does nothing of the sort.

■ The wage order states that the minimum wage will be raised for "fast food employees in fast food establishments," and such establishments are defined in relevant part as:

> "any establishment in the state of New York . . . which is part of a chain . . . and . . . which is one of [30] or more establishments nationally, including: (i) an integrated enterprise which owns or operates [30] or more such establishments in the aggregate nationally; or (ii) an establishment operated pursuant to a Franchise where the Franchisor and

---

**5.** Petitioner's claim in this regard is not assisted by the fact that, after the wage order was issued, the Legislature increased the statutory minimum wage but recognized the validity of existing wage orders such as the one here (*see* L 2016, ch 54, § 1, part K, § 5).

> the Franchisee(s) of such Franchisor owns or oper-
> ate[s] [30] or more such establishments in the ag-
> gregate nationally."

Nationally means "[n]ationwide in scope" and, as such, includes New York (Black's Law Dictionary [10th ed 2014], national). This language can in no way be read to exclude chains with locations solely in New York and, if a fast-food chain has at least 30 establishments anywhere in the United States, its component establishments in New York are subject to the wage order. The wage order also lacks any mechanism to assist chains with 30 establishments within New York at the expense of similarly sized chains with establishments located outside of it (cf. West Lynn Creamery, Inc. v Healy, 512 US 186, 195-196 [1994]). Accordingly, "there is no differential treatment of identifiable, similarly situated in-[s]tate and out-of-[s]tate interests, [and] there is no dormant Commerce Clause viola-tion" on the face of the wage order (Matter of Tamagni v Tax Appeals Trib. of State of N.Y., 91 NY2d 530, 539 [1998], cert denied 525 US 931 [1998]; see International Franchise Assn., Inc. v City of Seattle, 803 F3d 389, 400 [9th Cir 2015]; Matter of Pascazi v Gardner, 106 AD3d 1143, 1145 [2013], appeal dismissed 21 NY3d 1057 [2013], lv denied 22 NY3d 857 [2013]). Petitioner further asserts that the wage order violates the dormant Commerce Clause even if it is facially nondiscrimina-tory, but makes little effort to show how "the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits" (Pike v Bruce Church, Inc., 397 US 137, 142 [1970]; see Oregon Waste Systems, Inc. v Department of Environmental Quality of Ore., 511 US 93, 99 [1994]; Interna-tional Franchise Assn., Inc. v City of Seattle, 803 F3d at 405). There is nothing to suggest, in any case, that the wage order's effect on interstate commerce would outweigh the substantial local benefits that will flow from the desired objective of granting fast-food workers a wage enabling them to escape the bonds of public assistance and spend more money in the local economy.

Petitioner also claims that the wage board order was invalid because two board members appointed by the Commis-sioner were not true "representatives of the employers and employees" and, as such, lacked authority to sit on it (Labor Law § 655 [1]). This sort of factual challenge to a facially valid appointment offends the rule that "the acts of one who carries out the functions of a public office under color of authority are generally valid as to third persons and the public, and hence

immune from collateral attack, notwithstanding irregularities in the manner in which the officer was appointed" (*Matter of County of Ontario v Western Finger Lakes Solid Waste Mgt. Auth.*, 167 AD2d 848, 849 [1990], *lv denied* 77 NY2d 805 [1991]; *see Matter of Eadie v Town Bd. of Town of N. Greenbush*, 47 AD3d 1021, 1024 [2008]; *Morris v Cahill*, 96 AD3d 88, 90 [1983]). Inasmuch as petitioner failed to challenge the factual basis for the appointments in an appropriate manner (*see* Executive Law § 63-b; *Morris v Cahill*, 96 AD2d at 90), it will not be permitted to raise the issue now and undermine "the interests and reasonable expectations of the public, which must rely on the presumptively valid acts of public officials" (*Matter of County of Ontario v Western Finger Lakes Solid Waste Mgt. Auth.*, 167 AD2d at 849).

■ Petitioner also challenges specific terms of the wage order. To reiterate,

> "[i]n establishing minimum wages and regulations for any occupation . . . , the wage board and the [C]ommissioner shall consider the amount sufficient to provide adequate maintenance and to protect health and, in addition, [they] shall consider the value of the work or classification of work performed, and the wages paid in [New York] for work of like or comparable character" (Labor Law § 654).

Petitioner asserts that the wage order was deficient because it set a minimum wage for workers employed by fast-food establishments in chains with 30 or more establishments, impermissibly limiting the scope of the wage order to a subset of the "industry, trade, business or class of work in which employees are gainfully employed" rather than the entire occupation (Labor Law § 651 [4]). The wage board report did not limit the definition of the occupation itself, however, categorizing it as *"all* fast food workers performing functions related to preparing food and drinks, serving customers, and maintaining and protecting the property" (emphasis added). The wage board found that an increase in the minimum wage would be warranted for all of those workers but, because of documented concerns that smaller employers would face greater financial challenges in dealing with an increase, recommended limiting the increase to employees working for establishments affiliated with large chains and "better equipped to absorb" the costs. A minimum wage increase would not "provide adequate mainte-

nance and . . . protect the health of . . . [an] employee[ ]" if it imperiled the employee's job by financially crippling his or her employer (Labor Law § 655 [5] [a]; *see* Labor Law §§ 650, 654). As a result, the limits placed on the applicability of the wage order were a foray into "an area of reasonable administrative discretion into which" we will not intrude (*Matter of Wells Plaza Corp. [Industrial Commr. of State of N.Y.—New York Hotel Trades Council, AFL-CIO]*, 10 AD2d at 218; *see Matter of Lodging House Keepers Assn. of N.Y. v Catherwood*, 18 AD2d 725, 725 [1962]).

Petitioner makes a related claim that the selection of 30 or more establishments as the cutoff point is not sufficiently exact, but such a line need not be drawn with mathematical precision, and a rational basis in the record exists to support the one drawn here (*see e.g. Schneider v Sobol*, 76 NY2d 309, 314 [1990]). A franchising agreement gives significant advantages to a business owner by allowing him or her to benefit from an established brand name and customer base, use information and expertise not available to other small businesses, and exploit increased purchasing and borrowing power created by the pooling of resources within the franchise system. The wage board noted these advantages, all of which would assist an establishment in adjusting to a higher minimum wage for its workers, and there is nothing unreasonable in the belief that those advantages would be less potent in smaller fast-food chains.

Petitioner finally claims that the "value of the work" and "the wages paid in the state for work of like or comparable character" were not properly considered, but we disagree (Labor Law § 654). With regard to the wages paid for comparable work, the wage board pointed to proof that fast-food workers received wages well below those paid to other food service workers, noting that workers in full-service restaurants annually earn approximately 50% more than fast-food workers. As for the value of the work performed, fast-food workers spoke to the difficult nature of that work, which involved performing multiple tasks over irregular hours for employers who had little concern for the dignity of their employees or the environment in which they worked. A sociologist agreed that fast-food workers engaged in "a variety of complex tasks, often under extreme time pressure and poor working conditions," and opined that $15 an hour appropriately valued their work. The wage board further noted—correctly, in our view—that fast-

food chains have recently experienced significant increases in profit without an accompanying rise in wages for their workers, implying that those profits were " 'wrung from the necessities of their employees' " by undervaluing their labor (*West Coast Hotel Co. v Parrish*, 300 US 379, 397 [1937], quoting *Adkins v Children's Hospital of D. C.*, 261 US 525, 563 [1923] [Taft, Ch. J., dissenting]). A rational basis in the record therefore supports the factual findings underpinning the wage order and, as such, it will not be disturbed.

PETERS, P.J., LAHTINEN, EGAN JR. and MULVEY, JJ., concur.

Ordered that the determination is affirmed, without costs.