OPINION OF THE COURT
Emily Pines, J.
Factual and Procedural Background
Plaintiff, Concerned Home Care Providers, Inc., a not-for-profit trade organization, is made up of members consisting of home health agencies organized under Public Health Law article 36, all of which are located in the New York Metropolitan area. *280 Home Care Providers furnishes these members with educational, technical and legal support. Plaintiff seeks declaratory and injunctive relief against defendants, Governor Andrew Cuomo and the New York State Department of Health (DOH) (collectively, defendants), on the grounds that Cuomo, in mandating Executive Order No. 38 (9 NYCRR 8.38), and DOH, in adopting rules to effectuate the Governor’s mandate, committed an unconstitutional violation of the required separation of powers and improperly usurped the role delegated to the legislative branch of government. Plaintiff argues that in developing public policy, both the Governor and DOH acted far beyond the reach of their constitutional and/or statutory powers. As the subject regulations went into effect on July 1, 2013, Home Care Providers seeks a preliminary injunction (motion sequence 001) to avoid alleged immediate harm to the ability of its members to operate in an effective manner. Defendants oppose the motion, setting forth both that the Governor has the power to authorize Executive Order No. 38, calling for the subject regulations, and that DOH acted within its statutorily delegated powers to develop important regulations concerning the expenditure of state funds for proper health-related purposes. The defendants also move to change the venue of this action to Albany County (motion sequence 002), on the grounds that the rulemaking effectuated pursuant to Executive Order No. 38 affects numerous state agencies all located within Albany and that such transfer is desirable for the convenience of the witnesses who will need to be involved and in order to avoid numerous inconsistent verdicts. Plaintiff opposes the transfer of venue on the grounds that the current action is the sole one pending at this juncture; that the location of its offices in Suffolk County is sufficient; and that this case presents solely questions of law, not requiring any witnesses.
Plaintiff argues that DOH adopted the subject regulations pursuant to Executive Order No. 38 rather than via a legislative pronouncement, and without any other statutory authority. These regulations (10 NYCRR part 1002) have the effect of limiting the amount of state funds that can be used to pay for administrative expenses and executive compensation by entities that receive state funds or payments to provide health care services. Plaintiff asserts that it meets the three-pronged test to obtain preliminary injunctive relief. Plaintiff contends that it has shown a likelihood of success on the merits of its claim for declaratory relief because the promulgation of Executive Order No. 38 and the subsequent regulations involved the executive *281 and DOH in critical policy decisions, already specifically rejected by the legislature and delegated to that branch of government. Plaintiff asserts that this case falls squarely within tests set forth under what it terms the seminal Court of Appeals holding in Boreali v Axelrod (71 NY2d 1 [1987]). In that case, the Court of Appeals considered the constitutionality of actions taken by the Public Health Council (PHC) which had promulgated comprehensive regulations governing the use of tobacco in areas open to the public. The Court held that the regulatory act “stretched [the PHC’s enabling] statute beyond its constitutionally valid reach when it used the statute as a basis for drafting a code embodying its own assessment of what public policy ought to be.” (Id. at 9.)
The Court in Boreali found four existing factors to constitute “coalescing circumstances,” warranting its conclusion that PHC had usurped the legislature’s policy-making prerogative, when viewed in their entirety. (Id. at 11.) These included: (1) a code laden with exemptions based upon economic and social concerns; (2) provisions written on a clean slate without any broad legislation describing the overall policies to be implemented; (3) agency action where the legislative branch had repeatedly attempted and failed to reach agreement despite substantial public debate; and (4) lack of evidence of any use of experts to develop the subject rules. (Id. at 12-14.)
Plaintiff in this case contends that the regulations implementing Executive Order No. 38 suffer from each of the same frailties. The rules contain, for example, exceptions and exemptions clearly based upon economic and political concerns, including exemptions for Native American tribes, pharmacies, and medical equipment providers. Exempted from the salary caps are department chairs and chief medical officers at major hospitals; waivers are permitted based upon criteria selected by the Governor, including the size and complexity of the covered provider or the qualifications of the covered executive. According to Home Care Providers, the DOH regulations are based upon that agency’s own conclusions concerning the balance of trade-offs regarding costs and the industry involved. In arguing that DOH lacked any legislative input on the issues contained in the subject regulations, plaintiff specifically rejects DOH’s reference to authority allegedly relied upon by DOH and found in Public Health Law § 201 (1) (o), providing that such agency shall “regulate the financial assistance granted by the state in connection with all public health activities,” and section 201 (1) *282 (p) which delegates the agency with the authority: “as provided by law . . . [to] receive and expend funds made available for public health purposes pursuant to law.” Plaintiff asserts that there exists a huge gap between such general authority and the specific provisions of the subject regulations. Plaintiff also states that the legislature rejected legislation proposed by the Governor in his budget submissions essentially identical to Executive Order No. 38. Last, plaintiff asserts that there is no evidence that DOH consulted with any industry experts before drafting the subject regulations.
In support of its request for a preliminary injunction, plaintiff argues that the fact of a constitutional violation constitutes irreparable harm as a matter of law. In addition, plaintiff asserts that the regulations will adversely affect the ability of its member entities to generate or sustain revenues, thereby causing them to lose business opportunities and that money damages will not be an available option in a lawsuit involving an unlawful administrative regulation. As DOH has delayed implementation of the subject regulations for more than one year since they were first published in the State Register for comment, plaintiff also asserts that it prevails on the balancing of equities, clearly being in its favor.
In opposition to the motion, the defendants state that plaintiff cannot meet any of the three tests necessary prior to the grant of a preliminary injunction. Defendants argue that a party seeking to enjoin government action taken in furtherance of the public interest has a more rigorous burden of demonstrating the first test of a likelihood of success on the merits, which the plaintiff herein cannot meet. While defendants concede that the legislature is delegated the power to make critical policy decisions, and the executive to implement them, they counter that it is only when the executive branch acts inconsistently with the legislature that it violates the doctrine of separation of powers contained in our Constitution. Defendants cite the Court of Appeals decision in Bourquin v Cuomo (85 NY2d 781 [1995]), which states that non-action on the part of the legislature does not preclude the Governor from issuing executive orders relating to the identical issue. Plaintiff asserts that the state legislature is charged with passing a state budget and that Executive Order No. 38 is merely an implementation of the state policy of ensuring that taxpayer funds are utilized in the most effective and efficient manner.
Defendants argue that the DOH regulations do not fall within the proscriptions set forth in Boreali, for several reasons. First, *283 here the DOH regulations fall both within the broad statutory power granted DOH by the legislative body in the provisions of Public Health Law § 201 (1) (o) and (p) set forth above. The defendants also provide other legislative authority specifically handed to DOH. This includes Public Health Law § 206, which grants the DOH Commissioner:
“3. . . . [0]n behalf and in the interest of the health of the people of the state to enter into such contracts or agreements with . . . corporations ... as may be deemed necessary and advisable to carry out the general intent and purposes of the public health law .... Such contracts may provide for payment by the state, within the limit of funds available, for materials, equipment or services.”
Such statute also authorizes the commissioner to enter into subcontracts:
“6. . . . [W]ith any non-profit corporation, agency or association established for the purpose of improvement of health services or for the purpose of providing home care for sick and disabled persons, including nursing and other paramedical services (excluding physicians’ services) as may be needed by such persons.
“Such services may be provided by the state health commissioner by subcontract with a city or county rendering nursing and other paramedical services or any non-profit corporation, agency or association established for the purpose of . . . providing home care for the sick and disabled persons ....
“The state health commissioner shall establish fees to be charged for such services to be rendered pursuant to such contracts and, upon receipt of such fees, shall remit the same to the comptroller.” (§ 206 [6] [e].)
DOH also sets forth provisions of the Federal Social Security Act, title XIX (42 USC § 1396 et seq.), which specifically names DOH as the entity with the authority to act on behalf of the state for purposes of maintaining a plan by which it will receive financial assistance for medical purposes and states that
“[t]he department of health shall act for the state in any negotiations relative to the submission and approval of such plan and any amendments thereto and it may make such arrangements, not inconsistent with law, as may be required by or pursuant to *284 federal law to obtain and retain such approval and secure for the state the benefits of the provisions of such law.” (Social Services Law § 363-a [1].)
The defendants further assert that the DOH regulations, as well as Executive Order No. 38 are both consistent with the provisions of New York State law specifically regulating funds kept by executives of not-for-profit corporations within the state. Thus, they point to section 508 of the N-PCL, which provides, in pertinent part, that
“[a] corporation whose lawful activities involve among other things the charging of fees or prices for its services or products shall have the right to receive such income and, in doing so, may make an incidental profit. All such incidental profits shall be applied to the maintenance, expansion or operation of the lawful activities of the corporation, and in no case shall be divided or distributed in any manner whatsoever among the members, directors, or officers of the corporation.”
The regulations at issue are also, defendants state, within the properly promulgated authority created by Executive Order No. 38 relating to executive compensation and administrative expenses. As defendants set forth, the exceptions DOH writes into the regulations were rationally related to research specifically conducted by DOH and include exemptions of executives such as directors of nursing homes and CEOs of major hospitals, or similar types of personnel who fulfill administrative functions directly attributable to the program services they are providing. In addition, they argue that they have exempted businesses such as pharmacies, again rationally, because they essentially provide goods as opposed to services. The provision of waivers which are permissible under the regulations, where compliance would result in financial hardship for the health care provider or where the executive is found exceptionally qualified, are also rationally based upon DOH’s asserted research.
Thus, defendants argue that plaintiff cannot meet the rigorous test of likelihood of success on the merits, as, under the Boreali test: (1) the limited exceptions are rationally based upon agency research; (2) the Governor has the authority to regulate expenditure of state funds through administrative agencies and DOH has the express statutory mandate to regulate the financial assistance granted by the state for public health services as well as far more specific authority to enter into *285 contracts with, and even set the fees charged by, not-for-profit organizations which provide the very services rendered by the plaintiff herein; (3) no contrary legislation relating to these regulations exists or was specifically rejected by the legislature after numerous debates as in Borealv, rather, the Not-For-Profit Corporation Law specifically demonstrates statutory approval of a policy limiting executive retention of funds raised for the types of services rendered by such organizations; and (4) DOH conducted months of public comments and heard from numerous affected entities prior to establishing the subject regulations, amending the regulations in many respects in response thereto.
The effect of the regulations, according to DOH, is simply a requirement to reallocate a portion of the state funds a provider of services receives from executive compensation and administrative expenses toward direct program services; there is no reduction of the funding itself to any of the agencies subject to the regulation. With regard to the balancing of the equities, the harm to the state is assertedly far greater as the regulations have already gone into effect and are being implemented by 12 additional administrative agencies. In contrast, defendants argue that the plaintiffs claims of lost business opportunities and reduction in the quality of health care services are conclusory and speculative.
In support of its motion to change the venue of this action to Albany County, defendants argue that concerns of judicial economy and consistency are relevant to the issue of a discretionary change of venue under CPLR 510 (3). In this case, 13 state agencies have promulgated regulations pursuant to Executive Order No. 38, all of which have now gone into effect. According to the Senior Attorney of DOH, these include the Department of Agriculture and Markets, the Division of Criminal Justice Services, the Department of Corrections and Community Supervision, the Department of State, the Division of Housing and Community Renewal, the Office for the Aging, the Office of Alcoholism and Substance Abuse Services, the Office of Children and Family Services, the Office of Mental Health, the Office for People with Developmental Disabilities, the Office of Temporary and Disability Assistance, and the Office of Victim Services. Thus, defendants assert that the huge scope of the issues involved demands consistency in the outcome of litigations. In addition, defendants point out that Albany County is certainly appropriate as both the signing of the subject execu *286 tive order and the promulgation of the subject regulations all occurred in that venue. Finally, defendants argue that to the extent that plaintiff is seeking to enjoin a public officer from implementing regulations and the provisions of an executive order, CPLR 6311 requires venue to be placed in a term in the department where the officer is located.
In reply, the plaintiff argues that a review of legislative history demonstrates that the restrictions placed into Executive Order No. 38 regarding limitations on administrative costs and executive compensation for entities receiving state funds from certain agencies were placed into proposed legislation and rejected by that body. Plaintiff annexes to its reply papers a report on the amended state fiscal year 2012-2013 executive budget. The foregoing allegedly demonstrates that on January 17, 2012, New York Assembly Bill A9056 and New York Senate Bill S6526 of the Health and Mental Hygiene Budget Bill (Health Bill) was introduced with a part H containing limits on administrative expenses and an executive compensation cap of $199,000. On January 18, 2012, the Governor issued Executive Order No. 38 with the same language as part H of the above bills. Thereafter, on February 7 and February 16, the Governor made amendments to his proposed budget without any changes to part H; and on February 10 and February 17, 2012, the Health Bill was amended without any changes to part H. On March 11, 2012, the Health Bill was again amended and this time, part H was amended to eliminate limits on administrative expenses and executive compensation, replacing such with language requiring nonprofits to pay their executives a reasonable wage. On March 27, 2012, the agreed upon budget was submitted to the legislature without any limitations whatsoever on administrative expenses or a cap on executive compensation in part H of the Health Bill. Finally, on March 30, 2012, the final budget including part H of the Health Bill was passed and signed by the Governor without any of the language embodied in Executive Order No. 38.
In response to the motion to change venue, plaintiff argues that under CPLR 503 (c), venue is properly located in the county where one of the parties resides, and that, as a corporation, plaintiff is deemed a resident of the county in which its principal office is located, that being Suffolk County. With regard to the argument concerning convenience of witnesses, plaintiff asserts that such is only a factor where nonparty witnesses are concerned under Jarett v Berner (8 AD3d 236 [2d Dept 2004]), *287 and that defendants have not identified any nonparty witnesses who would be required to testify. Plaintiff acknowledges that CPLR 6311 states that a preliminary injunction to restrain a public officer or board from performing a statutory duty may only be granted by a Supreme Court at a term in the department in which the officer or board is located. However, in this case, plaintiff asserts that it is seeking to enjoin the Department of Health and not a board or public officer. In addition, plaintiff argues that it is not seeking to enjoin the performance of a statutory duty; but, rather the implementation and enforcement of regulations promulgated without statutory basis.
In surreply papers,* defendants provide the affidavit of Louis Raffaele, the Chief Budget Examiner of the Mental Hygiene Unit in the New York State Division of the Budget, for the purpose of stating that there was never a legislative rejection of limits on executive compensation and administrative expenses contained in Executive Order No. 38. According to Raffaele, the executive budget contains the executive’s plan of expenditures for the upcoming fiscal year and it is always accompanied by substantive legislation, known as article VII bills, which the Governor is authorized to amend periodically within certain time limitations. (NY Const, art VII, § 3; State Finance Law § 22 [16].) The State Constitution specifically authorizes the Governor to amend or supplement the budget, and, with the consent of the legislature, to amend any such bills as well as to provide the legislative branch with supplemental bills, under certain time constraints. (NY Const, art VII, § 3.) Raffaele states that the executive (Governor) as well as the Senate and Assembly often introduce and pass their own budget resolutions (known as “one house bills”) followed by a process of negotiation among the three bodies. He claims that such was precisely what occurred in this case. Thus, referring to the various proposals and amendments set forth in the plaintiff’s reply papers, he describes a process that occurred over several months, during which the Governor introduced, along with his initial budget submission, S6256 and A9056, both of which contained provisions that certain state agencies, including the State Education Department, impose limitations on executive compensation and administrative expenditures when utilizing *288 state funds. Raffaele states that one day after his submission, the Governor signed Executive Order No. 38, requiring again that certain state agencies promulgate regulations to impose the same limits relative to entities that receive state financial assistance or state authorized payments for the provision of services; however, the executive order specifically removed the State Department of Education from within the ambit of its mandate. The Governor then amended his version of S6256 and A9056 in February 2012. Raffaele states that thereafter both the Senate and the Assembly passed one house bills, each of which imposed limits on executive compensation, and each in its own version, with certain modifications of the Governor’s proposal, in March 2012. He asserts that, thereafter, negotiations among the Governor, Senate and Assembly ensued and resulted in an agreed-upon Health and Mental Hygiene article VII bill passed as 2012 New York Senate-Assembly Bill S6256-D, A9056-D. The bill was then signed into law on March 30, 2012. Raffaele states that the agreed upon bill did not contain the proposed language containing executive compensation solely because the Governor himself determined that the most effective manner of implementing the Governor’s proposal was through regulations that the subject agencies could amend as needed over time as well as during the implementation process. Raffaele states that the trade-off made with the other branch of government was the Governor’s removal of the Department of Education from within the ambit of the regulation. Thus, Raffaele argues that there was never a legislative rejection of the Governor’s proposed legislation as it was not included in the final enacted budget.
Discussion
Venue
CPLR 503 provides, in relevant part, that a case is to be tried in the county of residence of one of the parties at the time of commencement; and that corporations reside in the county where their principal office is located. An application to change venue rests in the sound discretion of the trial court. (Cavazzini v Viennas, 82 AD3d 1343 [3d Dept 2011].) As stated in that case, a change of venue will only be found warranted where “the convenience of material witnesses and the ends of justice will be promoted by the change” and must be supported “with detailed relevant information establishing that the convenience of the nonparty witnesses would be enhanced by the change” *289 (Cavazzini at 1344, quoting Singh v Catamount Dev. Corp., 306 AD2d 738, 738 [3d Dept 2003]). Although defendants have touted the “convenience of the witnesses” issue, there are no nonparty witnesses identified as required in the Court’s holding in Cavazzini. Moreover, as set forth above, this appears to be the first case brought challenging the subject regulations. In addition, as set forth in plaintiffs memorandum, this matter is not brought to enjoin the action of any public officer, board or municipal corporation; but, rather, regulations implemented by DOH and thus, CPLR 6311 is inapplicable. For the above reasons, the defendants’ motion to change venue is denied.
Preliminary Injunctive Relief
In order to obtain the extraordinary relief of a preliminary injunction, the moving party must demonstrate, by clear and convincing evidence, that there exists: (1) a likelihood of ultimate success on the merits of the underlying action; (2) that the movant will suffer irreparable injury absent the granting of the preliminary injunction; and (3) that a balancing of the equities favors the moving party. (Doe v Axelrod, 73 NY2d 748 [1988]; Gluck v Hoary, 55 AD3d 668 [2d Dept 2008].)
Separation of Powers
In Boreali v Axelrod, the Court of Appeals struck down as an unconstitutional usurpation of legislative authority, regulations promulgated by the PHC in 1987, prohibiting smoking in indoor areas open to the public, including schools, hospitals, auditoriums, food markets, stores, banks, taxicabs, and limousines; and requiring smoke-free areas in certain restaurants and places of employment. (71 NY2d at 6.) The regulations also contained numerous exceptions. They were assertedly promulgated by the PHC pursuant to the broad power granted it to “promulgate regulations on matters concerning the public health.” (Id.) This regulation was placed into effect following what the Court described as 40 legislative bills on the subject of smoking bans in various locations, each of which had been introduced between 1975 and 1987, without any having passed both houses of the legislature. (Id.) Based upon the provisions of article III, § 1 of the New York Constitution, which sets forth that “[t]he legislative power of this state shall be vested in the senate and assembly,” the doctrine has developed essentially providing that however broad a grant of authority, the legislative branch of government may not completely cede its policy-making responsibility to an administrative agency. (Id. at 9.) The Court, therefore, considered whether the broad delegation of authority *290 by the legislative branch to an administrative agency such as PHC was sufficient to permit the agency to promulgate the subject anti-smoking regulations, in the face of the legislature’s obvious inability to establish its own broad policy. (Id. at 8.) Utilizing the four factors set forth above, the Court determined that in such case, the agency had stretched the enabling legislation “beyond its constitutionally valid reach when it used the statute as a basis for drafting a code embodying its own assessment of what public policy ought to be.” (Id. at 9.)
Following Boreali, the Court of Appeals considered another attack on regulations promulgated by the PHC in Matter of New York State Health Facilities Assn. v Axelrod (77 NY2d 340 [1991]). In 1988, PHC adopted a set of regulations requiring any new applicants for nursing home approval to agree that their home admit a required percentage of Medicaid patients based upon the rate of Medicaid nursing home admissions in the particular county where each home was located. (Id. at 344.) The regulations did contain exceptions based upon factors such as a facility’s patient mix, including the intensity of care provided and also provided a system of requests for adjustments. PHC based its regulations upon the provision of Social Services Law § 363, which set forth that medical assistance for the needy was a matter of public concern, as well as the provision that the Department of Health (containing PHC) was the entity responsible for establishing and maintaining standards for nursing homes. (Id. at 347.) In addition, the Public Health Law provided that PHC was the entity delegated authority to determine whether to approve a nursing home, as well as the public need for such in a particular area. (Public Health Law § 2801-a [3]; New York State Health Facilities Assn. at 347.) Based upon such factors, the Court distinguished the case from Boreali, and stated, in relevant part:
“unlike Boreali, the basic policy decisions underlying the regulations have been made and articulated by the Legislature. Here, the Legislature, not the PHC, has chosen the ends to be accomplished: that participating nursing homes serve the needs of Medicaid patients and not discriminate against them in admission or retention. The choice of the appropriate means for achieving these ends, including the adoption of regulations, is well within the authority delegated to the agency for the purpose of administering the statute.” (Matter of New York State Health Facilities Assn. v Axelrod at 348.)
*291 The Court also considered the distinction that unlike the case in Boreali, the PHC was empowered to consider socioeconomic factors by virtue of its authority to consider public need. (Id.)
In Bourquin v Cuomo (85 NY2d 781 [1995]), the Court of Appeals considered a challenge to Executive Order No. 141 (9 NYCRR 4.141), which authorized the creation of a not-for-profit corporation for the purpose of representing the interests of utility customers in ratemaking proceedings, as well as providing such entity access to a minimum of four state agency mailings per year. The Court found that there is no requirement that there exist a specific detailed legislative mandate allowing a particular executive act for such to survive a separation of powers attack, so long as the “basic policy decisions underlying the regulations have been made and articulated by the Legislature.” (Id. at 785.) In Bourquin, the Court considered article 20 of the Executive Law, which empowered the Consumer Protection Board to protect the interests of consumers within the state. (Id. at 785, 786.) In that case, the Court rejected any argument that the executive’s creation of an agency, other than that created by the legislature, somehow prevented the Governor from establishing a different body, so long as the entity was intended to promote the same policies set forth by the legislative body. (Id. at 786.) In this vein, the Court of Appeals stated that it was following the policy set forth in Clark v Cuomo (66 NY2d 185 [1985]), which upheld against a separation of powers challenge an executive order establishing a Voter Registration Task Force with access to state agencies in distributing its material. (Id. at 785. ) In Clark, the Governor had relied on Election Law § 3-102 (13) providing the Board of Elections with the duty to encourage the broadest voter turnout. (Id. at 785.) The Court rejected the argument that the legislative decision to give powers to the Board of Elections prevented the Governor, through an executive order, from promoting the policies set forth in the Election Law, albeit through an entity created by the executive. (Id. at 786. )
In both Bourquin and Clark, the legislature had considered and failed to enact bills substantially similar to the provisions of the two executive orders at issue in those cases; and the Court of Appeals rejected such as being indicative of usurpation of legislative authority: “that proposed legislation similar to the Executive Order . . . was not passed does not indicate legislative disapproval of the programs contemplated by the order. Legislative inaction, because of its inherent ambiguity, ‘affords *292 the most dubious foundation for drawing positive inferences.’ ” (Clark at 190-191; Bourquin at 787-788.)
Recently, in Matter of Sullivan Fin. Group, Inc. v Wrynn (94 AD3d 90 [3d Dept 2012]), the Appellate Division, Third Department considered and rejected an attack upon Insurance Department regulations, which required insurance producers (basically consisting of agents and brokers) to disclose to prospective purchasers of insurance whether they were to receive compensation from an insurer, as well as any factor affecting their compensation. Based upon the agency’s authority to license and discipline insurance brokers set forth under Insurance Law article 20, the Court upheld the regulations against attack. (Id. at 94.) The Court also specifically rejected the argument that the legislature’s failure to enact a rule for disclosure of third-party compensation paid to insurance agents and brokers somehow barred the challenged regulations. (Id. at 95.)
Here, this court finds that the rules promulgated by DOH exist both pursuant to that agency’s specifically delegated statutory authority and are well within legislatively mandated policy. DOH is specifically delegated the authority to expend funds made available for health-related purposes and to regulate whatever financial assistance is granted by the state for health-related activities. (Public Health Law § 201 [1] [o], [p].) DOH’s authority, however, does not end with such broad general powers. Rather, it continues more specifically to include the power to enter into contracts that the agency itself deems necessary and advisable to carry out its broad functions and to provide for payment for materials, equipment and services. (Public Health Law § 206 [3].) DOH, as set forth above, is again specifically authorized by statute to enter into subcontracts with nonprofit corporations established to provide home care for the sick and disabled, and to establish the specific fees charged for the services those nonprofit entities render. (Public Health Law § 206 [6].) It is DOH that is delegated the authority, under federal law, to represent the state in securing financial benefits for medical purposes. (Social Security Act, tit XIX [42 USC § 1396 et seq.]; Social Services Law § 363-a [1].) These statutory provisions, taken together, fill in far more of the gap described in Boreali, between a general legislative grant of authority and specific regulations. Thus, in regulating financial assistance to be provided for health-related activities, it is DOH that has been specifically delegated the power to enter into contracts with agencies like the plaintiff herein, specifically for *293 the purpose of providing the services plaintiff provides, and to determine the actual fees to be charged by the plaintiff. It is the court’s belief that inherent in such authority is the power to determine the terms of such contracts so long as they do not deviate from other legal authority.
The court also finds that both Executive Order No. 38 itself and the DOH regulations are in accord with, rather than opposed to, legislative policy concerning the expenditure of funds by those corporations which are granted the benefit of not-for-profit status. As set forth above, the legislature has already stated that such entities, while maintaining the right to receive income, are only permitted to make an incidental profit, which must be applied to the operation of those activities which are deemed lawful for such entities and are not to be divided among the executives running the same. (N-PCL 508.) Thus, the legislature has already stated a policy that not-for-profit entities such as plaintiff herein are to utilize their funds for the programs they run. This is precisely what Executive Order No. 38 does in limiting nonprofits such as plaintiff from utilizing funds, over and above a set amount, for executive compensation and administrative expenses. The fact that the Governor chose Executive Order No. 38 in order to pursue this policy in his own manner, as occurred in Bourquin and Clark, does not render the order violative of the constitutionally protected doctrine of separation of powers.
In addition, unlike the regulations in Boreali, the executive order and the DOH regulations did not go into effect after numerous attempts and failures to enact legislation. Rather, they were never once voted upon by the legislature and were placed in the form of an executive order for the purpose of permitting periodic administrative amendment. As set forth in Bourquin, legislative inaction, which may be the most that occurred in this case, is not a basis for inferring legislative disapproval.
Moreover, the new rules contained within 10 NYCRR part 1002 did not go into effect instantaneously following their initial promulgation. Rather, as set forth in attachments to the papers submitted by plaintiff and defendants, a “Notice of Proposed Rule Making” was published in the State Register on both May 30, 2012, and after revisions made in response to numerous comments, again on October 31, 2012. (NY Reg, May 30, 2012 at 32-33; Oct. 31, 2012 at 42-44.) As set forth in the DOH published assessment, numerous revisions in the regulations *294 were implemented as a result of the comments. These changes, described in the 38-page document, included, inter alla, clearly defined administrative costs as distinct from program costs; modifications to the regulations to incorporate definitions used by the Internal Revenue Service; specific examples of entities rendering program services; a definition of executive compensation to exclude those portions of a salary not attributed to a covered program; a delay in the implementation of the regulations from its original contemplated date; the exclusion of certain nonrecurring administrative expenses; and greater flexibility in the filing of waiver applications. The comments made by the affected providers were clearly taken into consideration and in many cases resulted in changes to the regulations, often in a manner suggested by the commentators. The court raises this issue not to opine on the appropriateness of the changes, but only to confront the factor of “lack of expertise” raised by the Court of Appeals in Boreali. Here, DOH cannot be said to have written on a clean slate. Rather it took many comments of the providers of health-related services into account in revising the subject regulations.
Based upon the above determinations, the court finds that plaintiff has not sustained the heavy burden of demonstrating a likelihood of success on the merits of its action. With regard to its claim of irreparable injury, the failure of the first prong of the test, based upon a claim of unconstitutional action, carries the basis for inability to meet the requirement of irreparable injury, since such was based upon the same premise. The claims of lost business opportunities and reduction in the quality of health care are, in this court’s view, speculative.
With regard to the final criterion, a balance of the equities weighs in favor of the defendants. The Governor, through Executive Order No. 38, and DOH have required and set forth a series of regulations which essentially require those organizations providing health-related services with a certain amount of state funding to utilize the monies for the programs they are designed to run. This legislatively supported goal outweighs the allegations of harm set forth by the plaintiff in this case.
Accordingly, for the reasons set forth above, defendants’ motion for a change of venue is denied and plaintiffs motion for a preliminary injunction prohibiting the continued implementation of the subject DOH regulations is hereby denied.

 The court approved the defendants’ request to provide surreply papers and considered the same because the issue of the legislative history regarding the executive budget bills as well as the Senate and Assembly action on the same was first set forth in detail in the plaintiffs reply papers.